T.C. Memo. 2008-124


UNITED STATES TAX COURT


LARRY L. HARTMAN, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]


Docket Nos.  1371-85,  48690-86,     Filed May 1, 2008.
             4116-87,  15673-87,
            16761-87,  18551-88,
            29429-88.


        Ps' cases were part of the Kersting tax shelter
project, which the parties and the Tax Court tried to
resolve by using a test case procedure that resulted in
<u>Dixon v. Commissioner</u>, T.C. Memo. 1991-614 (Dixon II),
vacated and remanded sub nom. <u>DuFresne v. Commissioner</u>,
26 F.3d 105 (9th Cir. 1994), on remand <u>Dixon v.</u>

_____

        [1]Cases of the following petitioners are consolidated
herewith:  Wilbert L. F. and Valarie W. Liu, docket No. 48690-86;
and Jesse M. and Lura L. Lewis, docket Nos. 15673-87, 18551-88,
and 29429-88.

        [*]This opinion reconsiders and supersedes our previously
filed Memorandum Opinion <u>Lewis v. Commissioner</u>, T.C. Memo. 2005-
205.

Commissioner, T.C. Memo. 1999-101 (Dixon III), supplemented by T.C. Memo. 2000-116 (Dixon IV), revd. and remanded 316 F.3d 1041, 1047 (9th Cir. 2003) (Dixon V), on remand T.C. Memo. 2006-90 (Dixon VI), supplemented by T.C. Memo. 2006-190 (Dixon VIII) (on appeal).

In Dixon V, the Court of Appeals for the Ninth Circuit held that the misconduct of M (R's trial attorney) and S (M's supervising attorney) in arranging secret settlements with test case petitioners the Ts and the Cs was a fraud on the Tax Court. The Court of Appeals observed that the fraud not only violated the rights of the other test case petitioners and petitioners in more than 1,300 cases bound by the outcome of the test cases but also defiled the sanctity of the Court and the confidence of all future litigants. The Court of Appeals ordered the Tax Court to sanction R by entering judgments in favor of the remaining test case petitioners and other petitioners in the Kersting tax shelter group before the Court of Appeals, on terms equivalent to those provided in the Ts' secret settlement agreement. The Court of Appeals left the fashioning of such judgments to the discretion of the Tax Court.

Shortly before the trial of the test cases that resulted in the Tax Court's opinion in Dixon II, $P_1$ settled his cases on terms more favorable to him than R's project settlement offer but less favorable to him than the Ts' settlement, and stipulated decisions were entered in $P_1$'s cases.

After the trial, Dixon II opinion, and entry of decisions in the test cases, R's management discovered the misconduct of M and S when M attempted to have R assess deficiencies in the Ts' and the Cs' cases in accordance with the secret settlements rather than with the Court's decisions in those cases. In motions to vacate the decisions entered in the cases of the Ts, the Cs, and a third test case petitioner, R disclosed to the Court the misconduct of M and S. R concedes that stipulated decisions in Kersting project nontest cases entered after the Court filed its Dixon II opinion and before R disclosed the misconduct of M and S to the Court should be vacated.

While the remaining test cases were on appeal, R reinstated R's Kersting project settlement offer by means of an offer letter that contained material omissions. The offer letter stated: "Acceptance of this settlement offer will preclude any further challenge or appeal with respect to the Kersting programs or the merits of the <u>Dixon</u> opinion. Any other issues involved in this case will be resolved separately." $P_2$s (proceeding pro sese at the time) and $P_3$s (represented by counsel) accepted R's offer, and stipulated decisions were entered in their cases. Other Kersting project petitioners accepted the reinstated project settlement offer; as a result, stipulated decisions were entered in more than 400 cases.

The stipulated decisions entered in Ps' cases were not appealable and became final many years ago. Ps now seek to have their decisions vacated so that the sanctions mandated by the Court of Appeals in Dixon V can be imposed on R in their cases. Ps argue that, because they were bound by the decisions in the test cases, the fraud committed by M and S in the test cases necessarily adversely affected their cases. They ask this Court to impose on R the same sanctions mandated by the Court of Appeals in Dixon V for the fraud on the Court of M and S in the test cases which, they assert, is imputed to their cases.

In <u>Lewis v. Commissioner</u>, T.C. Memo. 2005-205, we denied the motions of $P_3$s for leave to file motions to vacate their stipulated decisions on the grounds they and their counsel had become aware of the misconduct of R's attorneys and of the pending appeals by test case petitioners when they agreed to the decisions. $P_3$s filed a motion for reconsideration asking us to reconsider our <u>Lewis</u> opinion on the ground that their settlement agreements did not encompass or foreclose imposing sanctions on R for the fraud M and S committed on the Court. We granted the motion for reconsideration, granted the motions for leave filed by $P_1$, $P_2$s, and $P_3$s, and consolidated the three sets of cases for purposes of this opinion. Upon reconsideration, we hold that the law of the case set forth in Dixon V requires that Ps' motions to vacate stipulated decisions be granted and that all Kersting project petitioners whose cases were bound by the test

cases and who suffered entry of stipulated decisions are entitled to the benefit of the T settlement.

1. <u>Held</u>: The fraud on the Court committed by R's attorneys in the test case proceedings constituted fraud on the Court in every case bound by the outcome of the test cases and harmed the integrity of the judicial process, not only as the test case procedure was employed in the Kersting project cases, but also as it might be employed in the future.

2. <u>Held</u>, <u>further</u>, imposing the sanctions against R in every case that was part of the Kersting tax shelter project is the appropriate sanction for the fraud committed in the test case proceedings because it serves to remedy the harm done to the judicial process, restore public confidence in the test case procedure, and rectify the violation of the rights of every petitioner bound by the outcome of the test cases.

3. <u>Held</u>, <u>further</u>, once R discovered the misconduct of R's attorneys, R had an obligation to fully disclose the misconduct, not only to the Court and the test case petitioners, but also to all petitioners who had been bound by the outcome of the Kersting project test cases.

4. <u>Held</u>, <u>further</u>, R's posttrial settlement offer did not adequately disclose R's attorneys' misconduct to the offerees and did not remedy or purge the fraud from the Kersting project cases.

5. <u>Held</u>, <u>further</u>, $P_2$s' and $P_3$s' requests that sanctions be imposed on R for the fraud committed on the Court are not a "challenge or appeal with respect to the Kersting programs or the merits of the Dixon opinion" encompassed by R's posttrial settlement offer, but rather encompass another issue in their cases that is to "be resolved separately" under the specific terms of that offer.

6. <u>Held</u>, <u>further</u>, the posttrial and other settlements and stipulated decisions entered in the cases at hand and in other Kersting project cases do not divest the Tax Court of its inherent power to impose sanctions against R for the fraud committed on the Court in those cases. See, e.g., <u>Bader v. Itel Corp. (In re Itel Secs. Litig.)</u>, 791 F.2d 672 (9th Cir.

1986) (party cannot avoid sanctions for committing fraud on the court by settlement or withdrawing from the case).

7. Held, further, the Tax Court has inherent power to impose sanctions against R for the fraud committed on the Court in every case that was part of the Kersting tax shelter project and may impose such sanctions either by vacating the decision in each such case and entering a new decision or by separate order imposing an equivalent monetary sanction. In the cases at hand, we are vacating the decisions.

8. Held, further, once the new decisions in these cases become final, the Court will issue an implementation order to allow R reasonable time to notify all remaining Kersting project petitioners against whom stipulated decisions were entered and to adjust their accounts administratively in accordance with the terms of the Ts' settlement. The Court will not accept for filing motions for leave to file motions to vacate the decisions in the cases of other such Kersting project petitioners unless R fails to adjust their accounts administratively within 9 months after the date of entry of the implementation order.

Robert Alan Jones and Declan J. O'Donnell, for petitioner Larry L. Hartman in docket Nos. 1371-85, 4116-87, and 16761-87 and for petitioners Jesse M. and Lura L. Lewis in docket Nos. 15673-87, 18551-88, and 29429-88.

Matthew K. Chung, for petitioners Wilbert L. F. and Valarie W. Liu in docket No. 48690-86.

Henry E. O'Neill, for respondent.

CONTENTS

Page

Introduction . . . . . . . . . . . . . . . . . . . . . . . . 8

Background . . . . . . . . . . . . . . . . . . . . . . . . 14

    I.    The Kersting Project Test Case Proceedings . . . . 15

    II.   Respondent's Discovery and Disclosure of the
    Thompson and Cravens Settlements . . . . . . . . . 32

    III. Kersting's Responses to Dixon II and Discovery and
    Disclosure of the Secret Settlements:  Letters to
    Kersting Program Participants and Formation of the
    Kersting Defense Group . . . . . . . . . . . . . . 41

    IV.  Respondent's Posttrial Settlement Offer . . . . . 44

    V.   The Lewis and Liu Settlements . . . . . . . . . . 49

    VI.  Disciplinary Actions Against McWade and Sims . . . 50

    VII. Appeals to the Court of Appeals for the Ninth
    Circuit and Proceedings on Remand . . . . . . . . 52

        A.   Ninth Circuit Remand: DuFresne v.
        Commissioner and Adair v. Commissioner . . . . 53

        B.   Evidentiary Hearing and Opinions on DuFresne
        Remand:  Dixon III and IV . . . . . . . . . . . 55

        C.   Gridley v. Commissioner . . . . . . . . . . . . 62

        D.   Dixon V:  Court of Appeals Again Reverses and
        Remands . . . . . . . . . . . . . . . . . . . . 63

        E.   Responses to Dixon V by the Office of Chief
        Counsel . . . . . . . . . . . . . . . . . . . . 66

        F.   Determination on Remand of Terms of the
        Thompson Settlement by Dixon VI and VIII . . 68

    VIII.  Motions To Vacate . . . . . . . . . . . . . . . . 72

Discussion . . . . . . . . . . . . . . . . . . . . . . . . 74

I.   Preliminary Comments . . . . . . . . . . . . . . .   74

II.  Analysis . . . . . . . . . . . . . . . . . . . . .   83

     A.   The Fraud on the Court Committed by
          Respondent's Attorneys, the Harm Done
          Thereby, and the Sanction Mandated by the
          Court of Appeals . . . . . . . . . . . . . .   84

     B.   <u>Lewis v. Commissioner</u> Reconsidered and
          Superseded . . . . . . . . . . . . . . . . .   94

     C.   Subsequent Voluntary Disclosure of the Fraud
          on the Court Does Not Purge the Fraud  . . . .   99

     D.   Respondent's Posttrial Settlement Offer Did
          Not Satisfy Respondent's Obligations to the
          Nontest Case Petitioners . . . . . . . . . .  101

     E.   Respondent's Posttrial Settlement Offer Did
          Not Rectify the Harm and Does Not Preclude
          Additional Sanctions . . . . . . . . . . . .  110

Conclusion . . . . . . . . . . . . . . . . . . . . . . .  127

Implementation of Sanction . . . . . . . . . . . . . . .  130

APPENDIX A . . . . . . . . . . . . . . . . . . . . . . .  134

APPENDIX B . . . . . . . . . . . . . . . . . . . . . . .  136

MEMORANDUM OPINION

BEGHE, <u>Judge</u>:  These consolidated cases are before the Court on petitioners' motions under Rule 162[2] to vacate stipulated decisions entered many years ago.  Petitioners' cases are broadly representative of hundreds of cases in which stipulated decisions were entered and of dozens of such cases in which motions for leave to file motions to vacate stipulated decisions have been filed.

<u>Introduction</u>

Petitioners' motions arise from the misconduct of respondent's attorneys in implementing the Court's test case procedure used by the Court in the Kersting tax shelter project to try and decide <u>Dixon v. Commissioner</u>, T.C. Memo. 1991-614 (Dixon II), vacated and remanded sub nom. <u>DuFresne v. Commissioner</u>, 26 F.3d 105 (9th Cir. 1994), on remand <u>Dixon v. Commissioner</u>, T.C. Memo. 1999-101 (Dixon III), supplemented by T.C. Memo. 2000-116 (Dixon IV), revd. and remanded 316 F.3d 1041 (9th Cir. 2003) (Dixon V), culminating with our disposition of the second remand in <u>Dixon v. Commissioner</u>, T.C. Memo. 2006-90 (Dixon VI), supplemented by T.C. Memo. 2006-190 (Dixon VIII).[3]  We

---

[2]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code.

[3]In <u>Dixon v. Commissioner</u>, T.C. Memo. 2006-97 (Dixon VII) and <u>Young v. Commissioner</u>, T.C. Memo. 2006-189, we responded to
(continued...)

have entered decisions in the 27 docketed cases that participated in the second remand; 13 of those cases are on appeal to the Court of Appeals for the Ninth Circuit,[4] where, we assume, they will be considered by the panel that decided Dixon V.[5]

In Dixon V, the Court of Appeals held that the misconduct of respondent's trial attorney and his supervisor was a fraud on the Court that violated the rights of all Kersting project petitioners who had agreed to be bound by the outcome of the Tax Court proceeding. The Court of Appeals ordered this Court to sanction respondent by entering decisions in the cases of the remaining test case petitioners and other Kersting project

---

[3](...continued)
the supplemental mandate of the Court of Appeals for the Ninth Circuit in Dixon v. Commissioner, 316 F.3d 1041 (9th Cir. 2003) (Dixon V), revg. T.C. Memo. 1999-101 (Dixon III), to determine the appellate legal fees to which Kersting project petitioners and their counsel in Dixon V were entitled. We have currently under consideration motions by various Kersting project taxpayers and their counsel for awards of fees and expenses for services rendered in the Dixon V remand proceedings in this Court.

[4]On July 6, 2007, Kersting project petitioners filed a notice of appeal in Hongsermeier v. Commissioner, docket No. 29643-86, a test case. On Sept. 10, 2007, Kersting project petitioners filed notices of appeal in Rogers v. Commissioner, docket No. 17993-95, Huber v. Commissioner, docket No. 20119-84 and Titcomb v. Commissioner, docket No. 17992-95, all nontest cases. On Sept. 17, 2007, Kersting project petitioners filed notices of appeal in test cases Young v. Commissioner, docket Nos. 4201-84, 22783-85, and 30010-85, and Owens v. Commissioner, docket No. 40159-84, and in nontest cases Adair v. Commissioner, docket Nos. 17642-83, 38965-84, 35608-86, 479-89, and 8070-90.

[5]The separate mandate of the Dixon V panel on appellate legal fees concluded: "The panel retains jurisdiction over all further proceedings that may arise."

petitioners before the Court of Appeals on terms equivalent to those provided in the secret Thompson settlement.

Petitioners signed stipulations to be bound (piggyback agreements) in which they agreed with respondent that their cases would be resolved in accordance with the Court's opinion in the test cases.[6]  Before the test cases were tried, respondent's trial attorney and his supervisor had entered into secret settlements with test case petitioners John R. and Maydee Thompson (the Thompsons) and John R. and E. Maria Cravens (the Cravenses). Also, before the test cases were tried, petitioner Larry L. Hartman (Hartman) settled his cases with respondent, and stipulated decisions were entered in his cases in January 1989.

After the Court had issued its opinion in Dixon II and entered decisions in the test cases, respondent's management

_____

[6]Although no piggyback agreement signed by petitioner Larry L. Hartman (Hartman) was filed in docket No. 16761-87, that case was not set to be tried with the test cases, and he was effectively bound by the results in the test cases in docket No. 16761-87, as well as in docket Nos. 1371-85 and 4116-87, in which he had signed piggyback agreements that were filed with the Court.  Normally, petitioners in a tax shelter project who decline or otherwise fail to sign a piggyback agreement will either have their cases set for trial with the test cases or, after the final decisions in the test cases, will be ordered to show cause why their case should not be decided the same way as the test cases.  See, e.g., Lombardo v. Commissioner, 99 T.C. 342, 343 (1992), affd. on other grounds sub nom. Davies v. Commissioner, 68 F.3d 1129 (9th Cir. 1995); Dixon VII; Dixon v. Commissioner, T.C. Memo. 2000-116 (Dixon IV).  In Dixon v. Commissioner, T.C. Memo. 2006-90 (Dixon VI), we held that Kersting project petitioners who did not sign piggyback agreements were entitled to the same relief as those who had signed piggyback agreements.  Dixon VI, 91 T.C.M. (CCH) 1086 at 1107, 2006 T.C.M. (RIA) par. 2006-090 at 2006-671.

discovered the secret settlements and disclosed them to the Court. Following that disclosure, respondent reinstated respondent's project settlement offer, which respondent had previously terminated before the trial that resulted in the Court's opinion in Dixon II. Petitioners Jesse M. and Lura L. Lewis (the Lewises), through their counsel, and petitioners Wilbert L. F. and Valarie W. Liu (the Lius), proceeding pro sese, accepted respondent's posttrial settlement offer, and stipulated decisions were entered in their cases in March and June 1993, respectively. The decisions in all of petitioners' cases herein were entered, and their cases were closed, before the Court of Appeals for the Ninth Circuit issued its opinion in DuFresne v. Commissioner, supra, vacating and remanding Dixon II for an evidentiary hearing to determine the full extent of respondent's misconduct and its effect on the decisions in the remaining test cases under Dixon II, which we did in our opinions in Dixon III and IV.

After the opinion of the Court of Appeals in Dixon V, reversing and remanding Dixon III and IV for entry of decisions in the remaining test cases in accordance with Dixon V, petitioners herein at various times in 2004 filed motions for leave to vacate the stipulated decisions entered by this Court in their cases.

Petitioners assert that the fraud on the Court perpetrated by respondent's trial attorney and his supervisor in the test cases was a fraud on the Court in their cases because they were bound by the outcome of the test case proceedings. Petitioners ask the Court to vacate the decisions in their cases so that the Court can impose on respondent in their cases the same sanctions mandated by the Court of Appeals in Dixon V for the fraud on the Court in the test cases as they apply to more than 1,300 pending cases in the Kersting project that did not settle.[7]

In Lewis v. Commissioner, T.C. Memo. 2005-205, we denied the Lewises' motions for leave to file motions to vacate their stipulated decisions on the grounds that they and their counsel had become aware of the misconduct of respondent's attorneys and of the pending appeals by test case petitioners when they stipulated the decisions.

The Lewises filed motions for reconsideration, which we granted. We also granted the motions for leave in the Lewis, Hartman, and Liu cases[8] in order to consolidate them for purposes

---

[7]As of Mar. 13, 2008, 1,173 Kersting project cases remained on the Court's inventory of docketed cases in which decisions have never been entered. The number of cases referred to in the text has been reduced by decisions that have been entered after and in accordance with our opinions in Dixon VI and VIII on the terms of the Thompson settlement. See infra note 33.

[8]In so doing, we departed from our usual practice--which we had followed in our Lewis opinion--of considering the merits of
(continued...)

of this opinion because they are all appealable to the Court of Appeals for the Ninth Circuit. We also chose to consolidate these cases because they include cases where stipulated decisions were entered both before the Court filed its Dixon II opinion (the Hartman decisions) and after respondent discovered respondent's attorneys' misconduct and disclosed it to the Court and reinstated the 7-percent project settlement offer (the Lewis and Liu decisions).

For purposes of these motions, we take judicial notice of our findings in Dixon III and IV, as modified by Dixon V, VI, and VIII (the Dixon findings) and supplemented by Lewis v. Commissioner, supra. Additional facts concerning earlier drafts of respondent's posttrial settlement offer are from copies of the drafts of the proposed settlement offer admitted into the records in these cases as the Court's exhibits. Otherwise, additional pertinent facts, as set forth in petitioners' motions, respondent's oppositions thereto, and the parties' replies to

---

[8](...continued) the underlying (lodged) motion to vacate decision in order to determine whether the moving party had alleged sufficient facts to call into question the validity of the decision. See Brannon's of Shawnee, Inc. v. Commissioner, 69 T.C. 999, 1002 (1978); see also Kenner v. Commissioner, 387 F.2d 689, 690-691 (7th Cir. 1968); Toscano v. Commissioner, 52 T.C. 295, 296 (1969), vacated on another issue 441 F.2d 930 (9th Cir. 1971); Campbell v. Commissioner, T.C. Memo. 1988-103. In the cases at hand, we granted petitioners' motions for leave in orders filed in June 2006 (Lius and Lewises) and October 2006 (Hartman), leaving for further proceedings our determination in this opinion whether the decisions can and should be vacated.

orders of the Court raising questions addressed to the parties, are undisputed.[9]

We believe that all the pending motions may be decided without a hearing.[10] On reflection and reconsideration, we now decide that the motions to vacate filed by the Lewises should be granted; we also hold that the motions to vacate filed by Hartman and the Lius should be granted. We conclude this opinion by describing the procedure for implementing our determination that all Kersting project petitioners against whom stipulated decisions were entered on or after June 10, 1985, are entitled to the benefits of the Thompson settlement. Giving effect to these decisions and that procedure will result in imposing on respondent in all Kersting project cases the sanctions mandated by the Court of Appeals in Dixon V.

## Background

When the petitions in these cases were filed, Hartman resided in Everett, Washington, the Lewises resided in Westlake Village, California, and the Lius resided in Aiea, Hawaii.

---

[9]Decisions in these consolidated cases are appealable to the Court of Appeals for the Ninth Circuit. Motions similar to those under consideration herein have been filed and lodged by other taxpayers whose decisions are appealable to Courts of Appeals for other circuits.

[10]Respondent agrees that the Court has before it the records that produced the Dixon findings and "strenuously opposes" the scheduling of an evidentiary hearing.

I.   The Kersting Project Test Case Proceedings

In response to the large volume of cases generated by tax shelter examinations during the late 1970s and early 1980s, the Internal Revenue Service (IRS) and the Tax Court developed procedures that were intended to streamline the litigation process, economize on the use of administrative and judicial resources, and reduce the costs incurred by taxpayers in resolving disputes over tax shelter adjustments.  The IRS, Office of Chief Counsel, in Washington, D.C. (the National Office), created the Tax Shelter Branch in the National Office to oversee tax shelter litigation across the country and to organize and supervise individual tax shelter projects.

One of the goals of the Tax Shelter Branch was consistent treatment of similarly situated taxpayers.  The Tax Shelter Branch monitored settlement offers in similar tax shelter projects for disparities and tried to determine whether the project settlement offers should be similar.  However, actual supervisory responsibility in a tax shelter project was left primarily in the Regional Counsel's office and the District Counsel's offices to which the project was assigned.

The deficiencies, additions to tax, and interest at issue in the Dixon II test case proceedings arose from petitioners' participation in tax shelter programs promoted by Henry F.K. Kersting (Kersting) that purported to generate interest

deductions for income tax purposes that exceeded amounts paid to participate in the programs. Kersting's promotions of his tax shelter programs attracted the attention of the IRS, which instituted a tax shelter project known as the Kersting project. Kersting actively opposed respondent's enforcement activities against his programs. In early 1982 Attorney Brian J. Seery (Seery) began assisting Kersting program participants with issues arising from audits of their income tax returns. On March 1, 1985, Kersting sent letters informing Kersting program participants that he had retained Seery to represent them in the Tax Court at no charge to them. Ultimately, more than 1,800 cases arising from taxpayers' petitions against respondent's deficiency notices disallowing deductions claimed by participants in the Kersting programs were filed in the Tax Court. The bulk of those deficiency notices were facilitated by respondent's having obtained Kersting's client records in a search of his office in Honolulu, Hawaii, in January 1981.

The IRS established the Kersting project in its Honolulu Appeals Office. In any given tax shelter project, a project Appeals officer typically works with a project attorney in the District Counsel's office. In the Kersting project, Kenneth W. McWade (McWade), in the Honolulu District Counsel's office, was the project attorney.

On March 20, 1985, Seery entered his appearance for hundreds of Kersting project taxpayers. The Court set for trial the cases of approximately 375 Kersting program participants to be held before Judge William A. Goffe (Judge Goffe) at a Tax Court session scheduled to commence on June 10, 1985, in Honolulu, Hawaii (the June 1985 session).

It would have been a daunting task to try the cases of the hundreds of similarly situated Kersting program participants who had filed petitions in the Tax Court. Before the June 1985 session, McWade and Seery agreed to use the test case procedure whereby a few typical cases are selected and most taxpayers whose cases are not selected execute "piggyback agreements" binding the resolution of their cases to the outcome of the final decisions in the test cases. During the June 1985 session, McWade and Seery discussed the use of the test case procedure with Judge Goffe during a chambers conference. Consistent with counsels' agreement to use the test case procedure in the Kersting project, Judge Goffe granted the parties' joint motions to continue the cases called at the June 1985 session. At the same time, as early as June 1985, Kersting project petitioners began filing piggyback agreements, which they did in most of the Kersting project cases.

On November 21, 1985, the Chief Judge of this Court assigned all the Kersting project cases to Judge Goffe for trial or other

disposition. Subsequent Kersting project cases were automatically assigned to Judge Goffe.

By letter dated June 10, 1986, McWade notified Judge Goffe that he and Seery had selected the cases of one individual, Ralph J. Rina (Rina), and seven couples, including the Thompsons, the Cravenses, and Jerry and Patricia A. Dixon (the Dixons), to be test cases. By letter dated July 30, 1986, Judge Goffe informed Seery and McWade that the test cases would be set for trial during a special session of the Court commencing on February 9, 1987, in Wailuku, Maui, Hawaii (the Maui session). Judge Goffe's letter also informed Seery and McWade that he intended to notify each Kersting project petitioner who had not filed a piggyback agreement that his or her case would be set for trial during the Maui session.

By letter dated August 5, 1986, Judge Goffe informed all Kersting project petitioners who had not already executed piggyback agreements that their cases would be set for trial at the Maui session unless they executed piggyback agreements by September 29, 1986. Judge Goffe's letter stated as follows:

August 5, 1986

Dkt #
Dear _____:

Your case involves matters concerning promotions by Henry Kersting. Cases with issues identical to the issues in your case have been set for trial on February 9, 1987, at the courtroom of the Circuit Court for the Second Circuit in Wailuku, Maui, Hawaii.

In order to conserve the time and expense of the taxpayers, the government and the Court, all of the cases with identical issues will be tried at one time unless the parties agree in advance, in writing, to be bound by the outcome of the cases set for trial. In most of the pending cases, the parties have so agreed to be bound.

You should contact at your earliest convenience the lawyer for the government in the Kersting cases if you decide to agree to be bound. He is Mr. Kenneth McWade, PJKK Federal Building, Room 3304, Box 50089, 300 Ala Moana Boulevard, Honolulu, Hawaii 96850. His telephone number is (808) 546-7333. If, however, you do not wish to be bound, you should advise my office promptly, in writing at the above address, in order that your case may be set for trial on February 9, 1987. In either event, you must advise Mr. McWade or me by September 29, 1986.

If you fail to advise Mr. McWade by September 29, 1986, that you wish to be bound and have executed a stipulation to be bound by that time and if you fail to advise me by September 29, 1986, that you wish to have your case set for trial, it will automatically be set for trial on February 9, 1987. If your case is set for trial and you do not appear for trial, your case will likely be dismissed and you will be required to pay all of the income tax which the government contends you owe, plus interest thereon as provided by law.

William A. Goffe
Judge

In November 1986 the Court issued orders notifying Kersting project petitioners who had not filed piggyback agreements that their cases were set for trial at the Maui session. As additional Kersting project cases were docketed and identified, the Court issued orders setting them for trial at the Maui session, subject to being stricken if the parties executed a piggyback agreement.

An attorney hired by the Thompsons to prepare an estate plan for them raised questions with Seery about his association with Kersting. On October 31, 1986, Seery filed a motion to withdraw as counsel for the Thompsons in their docketed cases, which the Court granted. In November 1986 the Thompsons engaged Luis DeCastro (DeCastro) to represent them before this Court.

In December 1986, following similar questions by the Court, Seery withdrew as counsel for the other test case petitioners and all the Kersting project nontest case petitioners for whom he had filed notices of appearance. In early January 1987, Kersting engaged Attorneys Robert J. Chicoine (Chicoine) and Darrell D. Hallett (Hallett) to represent the test case petitioners (with the understanding they would not represent Kersting). Chicoine and Hallett filed entries of appearance as counsel in each of the test cases (other than the Thompson and Cravens cases) and promptly challenged the deficiency notices in the test cases on the ground that the IRS search of Kersting's office in January 1981 had been illegal.

Between 1982 and 1988 respondent had in effect an official settlement offer for the Kersting project. In general, the project settlement offer permitted participants in the Kersting programs to resolve their cases by agreeing to pay deficiencies that averaged 7 percent less than those determined in their deficiency notices. The project settlement offer also released

participants from negligence additions and increased interest.
Respondent's purpose in offering these concessions and
adjustments was to provide similar treatment for all Kersting
program participants who wished to settle their cases.

Respondent's 7-percent reduction project settlement offer in
the Kersting project was similar to the IRS project settlement
offer in other tax shelter projects.  The 7-percent reduction in
the deficiencies reflected allowance of an assumed deduction for
the taxpayers' out-of-pocket expenses of participating in the
shelter.[11]

Although District Counsel generally is expected to adhere to
the terms of an official project settlement offer, once a tax
shelter project is assigned to a particular District Counsel's
office, that office has the authority to settle any individual
case in the project.  District Counsel has the authority in
special circumstances to settle individual tax shelter project
cases on a basis different from the project settlement offer.

By September 1986 McWade and Seery had agreed to modify the
7-percent reduction project settlement offer to incorporate a new
feature, called the burnout, that would apply in cases involving

---

[11]The 7-percent reduction in the deficiencies amounted to a
"nuisance value" settlement that respondent would not have
entertained or offered in a run-of-the-mill case.  See IRM sec.
8.6.1.3.3 (Feb. 18, 1999).  Nuisance value is any concession that
is made solely to eliminate the inconvenience or cost of further
negotiations or litigation and is unrelated to the merits of the
issues.

more than 1 taxable year.  Under the burnout, the interest on a taxpayer's total unpaid Kersting-related deficiencies for the first and second years of tax liability would not begin to accrue until the return due date for the second year.  This was accomplished by zeroing out the taxpayer's agreed deficiency for the first year and adding it to the agreed deficiency for the second year.  The burnout thus postponed for a year the accrual of interest on the first year's deficiency, thereby reducing the total interest accrued on the taxpayer's Kersting-related deficiencies.

In December 1986 McWade, with the knowledge and connivance of his supervisor, Honolulu District Counsel William A. Sims (Sims), entered into secret contingent settlement agreements with the Cravenses regarding their test cases and with DeCastro regarding the Thompsons' test cases.  The Thompsons and the Cravenses understood that a condition of these settlements was that they would remain test case petitioners.

The Cravenses, who were not represented by counsel, agreed with McWade to a reduction of about 6 percent of the originally determined deficiencies for their taxable years 1979 and 1980.[12]

_____

[12]In the Cravens notices of deficiency, respondent had determined that the Cravenses were liable for deficiencies for 1979 and 1980 of $4,508 and $19,251.70, respectively, and additions to tax for negligence under sec. 6653(a) for both years.  The deficiencies and negligence additions so determined were attributable to the Cravenses' participation in Kersting tax shelter programs.  The Cravenses' correct tax liabilities for
(continued...)

This settlement was less favorable to them than the generally available modified 7-percent reduction settlement offer and did not include the burnout.

The initial Thompson settlement in December 1986 reduced the Thompsons' total deficiencies by 18.8 percent,[13] eliminated the additions to tax for all years, and eliminated the increased interest rate under section 6621(d)[14] for 1981.  The initial Thompson settlement also incorporated the burnout, combining the agreed deficiencies for the years 1979 and 1980 in the year 1980 so as to postpone for 1 year the accrual of interest on the agreed 1979 deficiency.  On December 23, 1986, McWade sent

------

[12](...continued)
1979 and 1980 were $4,508 and $5,893.45, respectively, for a total of $10,401.45.  The $5,893.45 figure for 1980 represents the Cravenses' correct tax liability after eliminating the dividend adjustment set forth in the notice of deficiency for 1980 and backing out the tax on the capital gain that the Cravenses had reported on their 1980 tax return.  Decisions entered in the Cravens cases provided that the Cravenses were liable for deficiencies of $3,606.40 for 1979 and $6,175.76 for 1980, totaling $9,782.16.

[13]In the Thompson notice of deficiency, respondent had determined that the Thompsons were liable for deficiencies totaling $79,293 for the taxable years 1979-81, for additions to tax for negligence for 1979 and 1981, for increased interest for 1981 pursuant to sec. 6621(d), and for a late filing addition to tax for 1981 under sec. 6651(a).  The deficiencies, negligence additions, and increased interest were attributable to the Thompsons' participation in Kersting tax shelter programs.

[14]Sec. 6621(d) was redesignated sec. 6621(c) by the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 1511(c)(1), 100 Stat. 2744, and repealed by the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(b), 103 Stat. 2399.  We will hereinafter refer to the provision as sec. 6621(c).

DeCastro decision documents incorporating the above-described settlement. McWade's transmittal letter stated that the decision documents in the Thompsons' cases would not be filed with the Court until the decisions in the test cases had become final.

Around yearend 1986 the Thompsons paid $59,545 as interest on their then-agreed deficiencies. In March 1987 respondent and DeCastro agreed to a revision of the initial settlement that effectively increased the reduction in the Thompsons' deficiencies to approximately 20 percent. On June 15, 1987, the Thompsons halted further accrual of interest on the deficiencies by paying the then total amount owed of $63,000. By June 1987 payments by the Thompsons to the IRS with respect to the taxable years 1979-81 (less a $770 offset credited to another year) totaled $121,770.

Between September and December 1986 McWade and Sims began to entertain 20-percent settlements based on the same general approach as the modified 7-percent settlement offer that included the burnout. In late 1986 DeCastro obtained 20-percent reduction settlements on behalf of other Kersting project nontest case petitioners he represented, as did Chicoine and Hallett on behalf of other nontest case petitioners in the course of efforts to negotiate a global project settlement.

The enhanced 20-percent settlements reflected the concerns of McWade and Sims that Chicoine's and Hallett's challenge of the

IRS search of Kersting's office increased respondent's risks of litigation. The availability of the 20-percent settlements was not disseminated in writing by either Sims or McWade. The availability of 20-percent settlements became known, if at all, through a combination of Kersting's letters to program participants and telephone inquiries to McWade from Kersting program participants or their counsel.

In January 1987 Sims and Chicoine continued their efforts to negotiate a global settlement of the Kersting project cases. Initially, they tried to link a higher percentage settlement to Kersting's agreement to quit the tax shelter business. They eventually abandoned their efforts to link a global settlement to Kersting's future conduct.

By letter dated January 16, 1987, Chicoine notified Kersting that he believed he had an agreement with Sims to settle all the Kersting cases docketed in the Tax Court by allowing 50 percent of the claimed interest deductions. In that letter, Chicoine further stated that he and Hallett would agree to represent Kersting program participants desiring to settle their cases on these terms for a flat fee of $550 per case.

On January 19, 1987, Kersting wrote to program participants that a 50-percent settlement had been negotiated and recommended that they accept it. As a result of Kersting's letter,

approximately 300 Kersting program participants contacted Chicoine and Hallett seeking representation.

Following the release of Kersting's January 19, 1987, letter, Sims received numerous telephone calls from Kersting program participants and attorneys seeking to accept the 50-percent settlement. By letter to Chicoine dated February 4, 1987, Sims denied that he had agreed to a 50-percent settlement.

During spring 1987 Chicoine continued to discuss a global settlement with McWade. On or about April 27, 1987, Chicoine told Kersting he would recommend a 20-percent settlement to Kersting program participants. Between May 1987 and February 1988 Kersting wrote at least seven letters to Chicoine and Hallett strongly objecting to their dissemination of a 20-percent settlement proposal to Kersting program participants. On January 12, 1988, Kersting issued a letter encouraging nontest case Kersting program participants who had paid $550 to Chicoine and Hallett for representation in the settlement process to "recall your funds".

On February 8, 1988, Kersting wrote to Kersting program participants warning them that Chicoine and Hallett soon would circulate the details of a 20-percent settlement. Kersting urged Kersting program participants not to hire Chicoine and Hallett to settle their cases and instead to await the Court's opinion on the legality of the search (the issue that had been raised and

presented by Chicoine and Hallett).  During this period, Kersting threatened to sue Chicoine and Hallett if they reported the 20-percent settlement offer to the Kersting program participants.

On February 9, 1988, Chicoine sent letters to Kersting program participants who had contacted Chicoine and Hallett about representation.  Chicoine reported that McWade had offered to settle docketed Tax Court cases in accordance with the 20-percent settlement offer, recommended that program participants seriously consider that settlement, and suggested that those who desired to settle on those terms contact Chicoine and Hallett.

On February 11, 1988, the Court filed Dixon v. Commissioner, 90 T.C. 237 (1988) (Dixon I), holding that the test case petitioners had failed to establish standing to contest the IRS search of Kersting's office.

Kersting was displeased by Chicoine's and Hallett's proposed overall disposition of the Kersting project cases with only a 20-percent reduction in the deficiencies.  He fired Chicoine and Hallett and engaged Attorney Joe Alfred Izen, Jr. (Izen), to represent the test case petitioners at trial.

In April 1988 Chicoine and Hallett informed their test case petitioner clients that they were withdrawing as their counsel because of a disagreement with Kersting.  Chicoine and Hallett, however, continued to negotiate settlements for nontest case

petitioners, including Hartman. By letter dated June 9, 1988, Chicoine and Hallett informed McWade that Hartman wished to accept the 20-percent settlement with the burnout. McWade sent Chicoine stipulated decisions for Hartman's cases. Chicoine executed the decision documents on Hartman's behalf and returned them to McWade on November 30, 1988. McWade executed the decisions on December 12, 1988. On January 13, 1989, the Court entered the stipulated decisions in Hartman's cases at docket Nos. 1371-85, 4116-87, and 16761-87.

In the meantime, DeCastro told McWade the Thompsons were concerned about the legal fees they would incur as test case petitioners. DeCastro told McWade that it was unfair to require the Thompsons to remain test case petitioners and that he would attempt to remove the Thompsons' cases from the list of test cases. McWade wanted to keep the Thompsons as test case petitioners. DeCastro and McWade resolved their differences by further modifying the Thompson settlement. In particular, McWade agreed to reduce the Thompsons' deficiencies by an additional amount that would compensate them for the cost of having an attorney represent them at the trial of the test cases.

Shortly before trial of the test cases in this Court, McWade and DeCastro reached an oral agreement (the final Thompson agreement) in the Thompsons' cases calling for reduction of the agreed deficiencies for 1979, 1980, and 1981 to zero, $15,000,

and $15,000, respectively. The purpose of the final Thompson agreement was to generate a refund, estimated to exceed $60,000, that was to be used--and the bulk of which was used--to pay DeCastro's fees for providing the appearance of independent representation of the Thompsons at the trial of the test cases. Although McWade knew that IRS policy required him to treat similarly situated taxpayers alike, the financial terms of McWade's final settlement with DeCastro for the Thompsons were much more advantageous to them than McWade's settlements with other Kersting project petitioners.[15]

After the trial of the test cases, John R. Thompson (Thompson) expressed concern to DeCastro about incurring DeCastro's additional fees. DeCastro assured Thompson that DeCastro was looking solely to the IRS for payment of his fees and that the Thompsons would not be liable for any additional fees. On August 3, 1989, DeCastro wrote a letter to McWade, reducing the final Thompson agreement to writing. McWade signed the letter and returned it to DeCastro.

Sims, McWade, and DeCastro did not inform the Court, the National Office, the Regional Office, or counsel for the other test case petitioners or any of the other Kersting project petitioners or their counsel of the Thompson settlement or the

---

[15]With the exception of Denis Alexander, a nontest case petitioner with whom McWade made a special deal. See infra p. 30.

Cravens settlement.  McWade's deception continued with a coverup, which was carefully designed to prevent the Court and other Kersting participants from learning of the secret settlement agreements.  At Kersting's deposition, which McWade attended, Kersting's lawyer objected to the presence of the Thompsons' attorney because of rumors that the Thompsons were attempting to settle.  Although McWade knew that the Thompsons had, in fact, already settled, he remained silent.  McWade then misled the Court by failing to disclose the settlement on April 22, 1988, when he moved to set aside the Thompson piggyback agreements, a necessary pretrial motion that confirmed the inclusion of the Thompson cases among the test cases.

Before the trial of the test cases, McWade arrived at a general understanding with nontest case petitioner Denis Alexander (Alexander) that the Alexanders' tax liabilities for the taxable years 1974-77 would be reduced in exchange for Alexander's testimony and agreement to serve as an undisclosed consultant or assistant to McWade during the trial of the test cases.  McWade's understanding with Alexander is reflected in decision documents, executed by McWade on April 6, 1989, and approved by Sims, that completely eliminated all Kersting and other deficiencies determined against the Alexanders for those years.

On January 10, 1989, the test cases were consolidated for trial and opinion. The trial of the test cases was conducted from January 9 to 27, 1989, at Honolulu, Hawaii, with DeCastro representing the Thompsons and Izen representing all the other test case petitioners except the Cravenses, who were pro sese. McWade's deceptive silence matured into overt misconduct during the trial of the test cases; when Thompson began to testify about having settled his cases, McWade quickly interjected questions about unrelated matters. The diversion was successful; the Court mistakenly interpreted Thompson's remark as referring to resolution of the Thompsons' tax liability for another year that was not at issue. McWade also allowed Alexander to offer misleading testimony that prevented the Court from learning that McWade had agreed to zero out the Alexanders' tax liabilities.

On December 11, 1991, the Court issued its opinion in Dixon II, sustaining almost all of respondent's determinations that the Kersting programs in issue were ineffective for tax purposes.

In March 1992 the Court entered decisions in all the test cases in accordance with its opinion in favor of respondent. Consequently, the decisions initially entered in the Thompson and Cravens cases were not in accordance with their secret settlement agreements. Izen appealed the decisions against the test case

petitioners (with the exception of the Thompsons, the Cravenses, and Rina) to the Court of Appeals for the Ninth Circuit.

II.  Respondent's Discovery and Disclosure of the Thompson and Cravens Settlements

On May 8, 1992, after this Court had entered decisions in favor of respondent in all the test cases, McWade and Sims, by memorandum, requested the San Francisco Appeals Office to process the Thompsons' account administratively in accordance with the Thompson settlement, not the Tax Court's decisions.  On May 22, 1992, Danny Cantalupo, Regional Director of Appeals for the Western Region, informed Peter D. Bakutes (Bakutes), Deputy Regional Counsel for Tax Litigation for the Western Region in San Francisco, of McWade's and Sims's request to process the Thompson settlement.  Bakutes informed Benjamin Sanchez (Sanchez), Western Regional Counsel in San Francisco, who informed officials in the National Office.  The circumstances of the Thompson settlement caused widespread concern within the IRS.

On May 29, 1992, Sims, at the direction of Sanchez, informed DeCastro by letter that the Thompson settlement would not be honored, and that assessments would be made in accordance with the decisions entered on March 13, 1992, pursuant to Dixon II. The letter advised that assessment of the taxes owing, plus statutory additions and interest, would be "approximately $302,396.12".  The letter further noted:  "Of course, your

clients' advance payments will be credited toward the assessments."

DeCastro had several telephone conversations with respondent's officials, in which he maintained that the Thompson settlement, as memorialized in the August 3, 1989, letter agreement, was an enforceable contract, and that he would appeal any decision to the contrary.

Soon after Sanchez and Bakutes discovered the Thompson settlement, McWade and Sims disclosed the Cravens settlement to them. Sanchez promptly notified David Jordan (Jordan), Acting Chief Counsel, about the Thompson settlement. Sanchez and Jordan agreed that the Tax Court had to be notified immediately.

Bakutes prepared a motion that was filed in this Court on June 9, 1992, seeking leave to vacate the decisions entered in the Thompson, Cravens, and Rina test cases, which had not become final and had not been appealed. Unlike the Thompsons and the Cravenses, Rina had not entered into a settlement agreement with McWade and Sims, and the decision that had been entered in his case was in accordance with Dixon II. In the motion, respondent acknowledged that the existence of the secret agreements and "the failure to divulge same to the Court and the other Test Case petitioners prior to the trial raises questions which should be addressed by the Court and the parties after a full hearing before the Court." Respondent requested the Court to conduct an

evidentiary hearing to determine whether the agreements with the Cravenses and the Thompsons had affected the trial of the test cases or the ensuing decisions of the Court.

On or about June 11, 1992, Sanchez decided that McWade and Sims should no longer have any authority over the Kersting project and that all Kersting project cases should be assigned to other attorneys who were familiar with the Kersting project. Bakutes accordingly reassigned the 14 test case dockets to Thomas A. Dombrowski (Dombrowski) and the nontest cases to Henry E. O'Neill (O'Neill).

On June 22, 1992, the Court granted respondent's motions to vacate in the Thompson and the Cravens cases. The Court ordered the parties within 30 days to file agreed decisions or otherwise move as appropriate. The Court denied respondent's request for an evidentiary hearing. In a separate order entered on the same date, the Court denied respondent's motion to vacate the decision in the Rina test case, stating:

> The Court has reviewed the testimony of Cravens, the testimony of Thompson, the stipulated facts and stipulated exhibits relating to the Cravenses and the Thompsons, and the exhibits offered through Thompson as a witness. The Court finds that these reviewed items had no material effect on the opinion which the Court filed on December 11, 1991, as that opinion relates to petitioner Rina. If the reviewed items were stricken from the record, the Court would file an opinion in all material respects like the opinion it filed on December 11, 1991 (with the exception of certain portions relating specifically and expressly to the Cravenses or the Thompsons), and the Court's findings, analyses, and

conclusions relating to petitioner Rina would remain the same. * * *

The Court's order denying respondent's motion to vacate the decision in the Rina case was consistent with this Court's holding in Chao v. Commissioner, 92 T.C. 1141 (1989), that the Court will not vacate a decision if a new trial would not result in a different decision. Rina appealed his decision to the Court of Appeals for the Ninth Circuit, where appeals in the other Kersting project test cases were pending.

The same day the Court acted on respondent's motions to vacate, Bakutes telephoned DeCastro to tell him that the decisions in the Thompson cases had been vacated. During the call, DeCastro told Bakutes that in 1988 McWade had reduced the Thompsons' deficiencies to keep the Thompsons in the test case trial. Although DeCastro had earlier told Bakutes that attorney's fees had not figured in the settlement, he admitted in this conversation that the deficiencies had been reduced to pay the Thompsons' legal fees for his representation of them in the test case trial.

During the summer of 1992, Jordan directed two senior attorneys in the Tax Litigation Division in the National Office, Thomas J. Kane (Kane) and Steven M. Miller (Miller), to investigate the Thompson settlement on behalf of the National Office. Kane and Miller conducted in-house depositions and

interviewed various individuals who had participated in the test case trial and the Thompson settlement.

Bakutes assigned Dombrowski to help Kane and Miller in their investigation. Dombrowski's immediate problem was how to respond to this Court's order of June 22, 1992, that within 30 days the parties file agreed decisions or otherwise move.

On June 24, 1992, Marlene Gross (Gross), an official in the National Office, called Bakutes and informed him that the Department of Justice (DOJ) would not seek remand of the test cases that had been appealed. The DOJ's decision was based on the Tax Court's refusal to vacate the decision in the Rina case. That refusal indicated to the DOJ officials that the Tax Court would probably reject any request by respondent to vacate the Court's decisions in the other test cases. Gross also reported to Bakutes that the DOJ, specifically the Tax Division's Appellate Section Chief Gary Allen, wished to offer the same settlement to the test case petitioners on appeal that the Thompsons had received: a 65-percent reduction in deficiencies (a rough approximation of the reduction of the Thompsons' originally determined deficiencies from $79,293.52 to the $30,000 figure finally agreed upon). Bakutes was opposed to settling the appealed cases on that basis, and no settlement offer on that basis was made to the test case petitioners on appeal.

In July 1992 DeCastro filed a motion for entry of decision in the Thompson cases in accordance with the final agreement he had reached with McWade shortly before trial; i.e., deficiencies of zero, $15,000, and $15,000 for 1979-81, respectively. On August 20, 1992, respondent filed objections to DeCastro's motion for entry of decision, together with respondent's own motions for entry of decision and an accompanying memorandum. Respondent's motion acknowledged that the Thompsons were entitled to the original 18.8-percent reduction settlement agreed to by McWade and DeCastro in December 1986 and sought decisions to that effect; respondent argued that the "New Agreement", intended to pay the Thompsons' legal fees, was unauthorized and had no legal basis.

Respondent's 11-page motion for entry of decision, with a 15-page supporting memorandum, set forth the facts regarding the Thompson settlement that had been discovered by IRS senior officials. Respondent informed the Court that before the test case trial McWade and Sims had agreed to sweeten the prior settlements of the Thompson cases by further reducing the Thompsons' deficiencies in order to compensate them for their projected attorney's fees. As respondent explained to the Court, McWade and Sims had agreed with DeCastro that

> All settlement refunds in excess of the amounts
> provided by the December 1986 agreement would go
> ultimately to the benefit of Mr. DeCastro for payment
> of his legal fees and costs. Mr. DeCastro would be

paid solely from amounts refunded by the Service to Thompson. * * * This "New Agreement", in sum and substance, if not explicitly, was designed, and constituted an agreement by Messrs. Sims and McWade to pay Mr. DeCastro's legal fees and expenses.

Respondent's motion papers compared the amounts of the Thompsons' deficiencies originally determined for the 3 years at issue, totaling $79,293.52, with the unauthorized "New Agreement" reducing the deficiencies to zero, $15,000, and $15,000, or total deficiencies of only $30,000, thus generating the refunds used to pay DeCastro's legal fees. These figures, without more, indicate that the "New Agreement" represented a 62-percent reduction of the deficiencies respondent originally determined.

In respondent's memorandum of points and authorities in support of respondent's motion for entry of decision, respondent acknowledged that "counsel for both parties owed a special obligation of candid disclosure to this court given the highly unusual circumstances which were of their own making." Respondent acknowledged that the Rules of this Court and the Model Rules of Professional Conduct require the utmost candor to the Court, "which duty would proscribe misleading the court by silence, inaction, or failure to apprise the court of any material fact that may affect the proceeding before the court." Respondent further acknowledged:

> as officers of the court, both the District Counsel attorneys and petitioners' counsel owed a special duty to disclose to this court that they had entered into an agreement to settle the litigation and that District

Counsel William Sims agreed in substance to pay the litigation expenses of his adversary. See Booth v. Mary Carter Paint Co., 202 So. 2d 8 (Fla. Dist. Ct. App. 1967); 2 Moore's Fed. Practice Par. 23.23. In Reager v. Anderson, 371 S.E. 2d 619, 630 (W. Va. 1988), the court, commenting upon the duty of candor to the court, observed that "(i)t is critical to the fair conduct of the trial to disclose promptly the settlement terms to the court and to opposing counsel so that the court can decide whether the agreement is valid, and if so, what measure will be taken to ensure that the nonsettling party(ies) will not be prejudiced." We believe that this is particularly important where the settling party remains in the litigation, testifies with respect to the issues, and his attorney appears to be an advocate adverse to the party paying the fees.

On August 26, 1992, the Court entered orders and decisions in the Thompson cases summarily denying respondent's motion for entry of decision, granting DeCastro's motions for entry of decision, and entering decisions in accordance with the final Thompson agreement.

Respondent did not appeal the decisions the Court entered in the Thompson and the Cravens cases. As a result, those decisions became final, while Rina and the other test case petitioners, who had appealed the decisions entered in their cases, added the newly revealed facts about the misconduct of respondent's attorneys to the grounds for their appeals.

The rationale of the Office of Chief Counsel for not appealing the Tax Court's entry of the decisions giving effect to the Thompson settlement was set forth in a memorandum, dated September 8, 1992, prepared by Kane:

The Chief Counsel [Abraham N.M. Shashy, Jr.] and Deputy Chief Counsel have concluded that, under the circumstances, we have completely fulfilled all applicable ethical and legal obligations with respect to this issue and this litigation. They have also concluded that given the fact that the conduct on the part of our attorneys is significantly less than exemplary, there is nothing to be gained by further prolonging this aspect of the Kersting litigation.

On September 30, 1992, Judge Goffe terminated his recall status as a Senior Judge and retired from the bench. The Chief Judge of the Tax Court reassigned the Kersting project cases to Judge Renato Beghe.

In October 1992 Izen and Robert Patrick Sticht (Sticht), representing various nontest case petitioners, filed separate motions with the Tax Court to intervene in the Thompson and Cravens cases, before the newly entered decisions in those cases had become final. Sticht and Izen maintained that their clients should be allowed to intervene in those cases in order to assert that McWade had committed fraud on the Court by arranging the Thompson settlement and failing to inform the Court or the other parties.

On November 6, 1992, we denied the motions to intervene. Izen and Sticht filed notices of appeal of our denials of their intervention motions, again alleging fraud on the Court.

III. <u>Kersting's Responses to Dixon II and Discovery and</u>
<u>Disclosure of the Secret Settlements:  Letters to Kersting</u>
<u>Program Participants and Formation of the Kersting Defense</u>
<u>Group</u>

After the Court filed Dixon II, Kersting kept the participants in his programs informed about the status of the test cases.  In February 1992, Kersting sent a lengthy "Dear Friend" letter to the participants in his programs, informing them that Izen was preparing an appeal of Dixon II in the test cases to be filed with the Court of Appeals for the Ninth Circuit.  Kersting's letter also said he had formed a defense team of attorneys and included with the letter a copy of the business card of "R.A.J. Limited, Robert Alan Jones, Esq., President".

Subsequently, Attorneys Robert Alan Jones (Jones) and Declan J. O'Donnell (O'Donnell) announced the Henry Kersting Tax Defense Group.  A defense group brochure created in May 1992 describes the legal services O'Donnell and Jones would offer to Kersting program participants.  The brochure included a description of the qualifications and practice backgrounds of O'Donnell and Jones, along with retainer agreements and copies of relevant memoranda and correspondence.  One such memorandum, entitled "Status of the Kersting Cases", signed by O'Donnell and dated May 12, 1992, said that most of the Kersting program participants had executed piggyback agreements to be bound by the results in the test cases and that the test cases had been decided for the Government.  It

said that the deadline for filing an appeal was June 11, 1992, and that Izen was representing the test case petitioners and would handle the appeal.

After the Court had denied respondent's motions to vacate the Rina decision and for an evidentiary hearing and had vacated the original Thompson and Cravens decisions, Jones and O'Donnell wrote Dombrowski a joint letter dated June 24, 1992. They informed Dombrowski that they represented approximately 100 Kersting project taxpayers and that they understood Dombrowski had replaced McWade as respondent's counsel because of an ethical concern regarding the impropriety of the secret settlements with the Cravenses and the Thompsons.

The letter acknowledged that the Court had concluded that the newly disclosed "Contingent Settlements" would not change its opinion in any material way and had denied a motion to vacate decision filed in a case that was not on appeal. The letter also stated that motions to remand were pending before the Court of Appeals for the Ninth Circuit in cases that had been appealed.

By letters dated June 24 and August 12, 1992, Jones and O'Donnell asked Dombrowski to provide informal discovery regarding the Thompson and Cravens settlements. Respondent refused their informal discovery requests and did not allow them to participate in any of respondent's in-house investigations.

In a letter dated July 31, 1992, Kersting informed the Kersting program participants that Izen and Sticht were "exposing the government's fraud and perfidy in a secret deal between Cravens and Thompson on the one hand, and IRS attorney McWade (and other government officials) on the other hand." Kersting explained his version of the misconduct of the Government's attorneys as follows: "As many of you already know, the growing scandal in the 'piggyback' cases involves a settlement in favor of Cravens/Thompson in exchange for their damaging testimony and exhibits that were all put together as part of a prearranged plan to influence and persuade Judge Goffe to rule against us."

On September 14, 1992, Kersting wrote another "Dear Friend" letter informing the Kersting participants of further developments. Kersting said the misconduct of Sims, McWade, and DeCastro "threw the appeals schedule into turmoil and motions had to be filed to ask for an extension of time for filing the Appeal." Kersting advised them to ask for "the same concessions arranged by the Revenue Service to Thompson and Cravens. An arrangement whereby $100,000.00 of taxes allegedly owed were reduced to a mere $15,000.00." This "Dear Friend" letter concluded by disclosing that relations had soured between Kersting and the "Henry Kersting Tax Defense Group" of O'Donnell and Jones.

IV.  Respondent's Posttrial Settlement Offer

In July 1992 respondent's National Office began in-house discussions about offering a 7-percent reduction settlement to Kersting project petitioners who were bound by the test cases through piggyback agreements.

On September 9, 1992, Dombrowski sent a draft of a proposed settlement offer letter (Dombrowski draft) to Paul Zamolo, Acting Deputy Regional Counsel.  The Dombrowski draft explained that the Tax Court had issued its Dixon II opinion disallowing the interest deductions, imposing additions to tax for negligence under section 6653 and substantial understatement of tax under section 6661, and finding that the increased interest rate under section 6621(c) applied.  The Dombrowski draft stated that five of the test case petitioners (Dixon, DuFresne, Hongsermeier, Owens, and Young) were appealing their cases in the Ninth Circuit, but that the appeals had not yet been resolved.  The Dombrowski draft further stated that respondent had moved to vacate the decisions in the Cravens, Rina, and Thompson test cases because "it appeared that a settlement agreement had been reached with two [sic] of the test case petitioners, the Cravens [sic] and the Thompsons, prior to the trial of the test cases."  The Dombrowski draft then described the action taken by the Court as follows:

> The Tax Court granted the Motions to Vacate
> Decision which were filed in the Thompson and Cravens
> cases.  The Court directed the parties to either file
> agreed decisions or motions regarding the decisions to

be entered in the cases.  Agreed decisions were filed in the Cravens' cases reflecting the Cravens' pre-trial acceptance of the standard Kersting settlement offer. The parties were unable to agree on the decisions to be filed in the Thompson cases.  Thereafter, motions for entry of decision were filed by both the government and the Thompsons.  The Tax Court granted the Thompsons' motions and entered decisions accordingly.

The Court denied the Motion to Vacate Decision filed in the third case involving petitioner Ralph J. Rina.  In denying the Motion to Vacate Decision the Court stated that the testimony and evidence offered by Mr. Thompson and Mr. Cravens had no material effect on the opinion as it related to Mr. Rina and therefore the Court's findings, analyses and conclusions relating to him would remain the same.  Accordingly, all Kersting interest deductions were disallowed and all additions to tax were sustained as to Mr. Rina.  * * *

* * * It is the Service's belief that the trial Court's disallowance of interest deductions and the imposition of the additions to tax will be upheld on appeal.

The Dombrowski draft then stated that the IRS had decided to renew its previous offer of the 7-percent settlement including the burnout and enclosed a form on which the taxpayer could indicate his/her acceptance of the offer.  The Dombrowski draft stated: "the offer applies only to adjustments resulting from your participation in the various Kersting programs referred to above. Any other adjustments raised in your case will be considered on an item by item basis and will be settled or litigated as appropriate."

A September 30, 1992, shorter draft of a settlement proposal prepared by Sanchez (Sanchez draft) gave much less detail than the Dombrowski draft.  The Sanchez draft referred to the Tax Court's

decision but did not name the case or cite Dixon II.  It only

identified Cravens as one of two test cases in which "some

irregular and undisclosed agreements" had been reached.  The

Sanchez draft stated that the Tax Court had concluded that the

outcome of the trial was unaffected by the irregular activity and

that decisions had been entered in the two test cases enforcing

the undisclosed agreements.  The Sanchez draft did not identify

any of the other test cases or mention that some of those cases

were being appealed.  The Sanchez draft stated:

> We believe that the Cravens situation is
> indistinguishable from your own.

> \*       \*       \*       \*       \*       \*       \*

>     We have determined that the Cravens [sic] in good
> faith believed that they had a valid settlement
> agreement prior to the trial.  Because they were not
> represented by counsel, they could not be expected to
> have detected any irregularity on our part.

>     Because the Cravens [sic] received the benefit of
> this offer even after trial, we believe that fundamental
> fairness compels that you should receive the same
> treatment.  Therefore, we will apply the benefits of
> that treatment to your case.

The Sanchez draft stated that the adjustments to the

taxpayer's account with the IRS would be made administratively and

required no further action by the taxpayer.

A third draft dated October 26, 1992, prepared by Kane (Kane

draft), was also less detailed than the Dombrowski draft.  The

Kane draft cited Dixon II but did not identify any of the other

test cases.  The Kane draft stated that two of the test case

petitioners had entered into settlement agreements that had not been disclosed to the other test case petitioners or the Tax Court but did not identify the taxpayers who had entered into the undisclosed settlement agreements. The Kane draft stated that the Tax Court had concluded that the outcome of the trial was unaffected by the testimony of the test case petitioners who had settled their cases. The Kane draft stated: "This means that the opinion of the Tax Court, as it affects you, remains unchanged." The Kane draft did not disclose that the Dixons and some of the other test case petitioners had filed appeals with the Court of Appeals for the Ninth Circuit.

The Kane draft stated that "fundamental fairness dictates that you be afforded an opportunity to settle your case on similar grounds". The Kane draft, like the Sanchez draft, indicated that, if the taxpayer's case had been settled, the adjustments would be made administratively without requiring further action from the taxpayer. If the case was still pending in the Tax Court, the taxpayer had 60 days to accept the offer. The Kane draft stated that acceptance of the offer would "preclude any further challenges or appeal with respect to the merits of the Dixon opinion as applied to your case(s)."

On January 8 and 29, 1993, respondent made mass mailings extending a global settlement proposal to all known Kersting project nontest case petitioners and their counsel (posttrial

settlement offer).  The posttrial settlement offer informed

petitioners that the Court had issued its opinion sustaining all

the adjustments and cited Dixon II.  It explained that, after the

trial of the test cases:

> It subsequently came to our attention that two of
> the test case petitioners had entered into settlement
> agreements with the Service prior to the trial, and that
> these agreements were not disclosed to the Tax Court or
> the other test case petitioners.  The settlement
> agreements provided that these particular test case
> petitioners could proceed to trial, but would receive
> the benefit of the better of their pretrial settlement
> agreement or the results of the trial.  The Tax Court
> has since been advised of this situation and has
> concluded that the outcome of the trial was not affected
> by the testimony of these test case petitioners.  This
> means that the Tax Court opinion, as it pertains to
> other Kersting cases, remains unchanged.  However, in
> light of these recent developments, we have concluded
> that in fairness all petitioners be afforded an
> opportunity to settle their cases.

In general, the posttrial settlement offer represented a

revival of the official project settlement that respondent had

offered during 1982-88.  It permitted taxpayers to resolve their

cases by agreeing to pay deficiencies that were 7 percent less

than those determined in their deficiency notices.  Respondent

would impose no penalties or additions to tax, and taxpayers would

pay interest only at the generally applicable (i.e., non-

tax-motivated) rate under section 6621(a).  The posttrial

settlement offer did not include the burnout.

The posttrial settlement offer further stated:  "Acceptance

of this settlement offer will preclude any further challenge or

appeal with respect to the Kersting programs or the merits of the Dixon opinion.  Any other issues involved in this case will be resolved separately."  Taxpayers were given 60 days within which to accept or reject the posttrial settlement offer.

V.    The Lewis and Liu Settlements

In a letter dated March 11, 1993, O'Donnell informed respondent's counsel that the Lewises had decided to accept the posttrial settlement offer.[16]  Thereafter, respondent forwarded a stipulated decision document to O'Donnell and Jones reflecting a disposition of the Lewises' cases on the terms set forth in the posttrial settlement offer.  On May 17, 1993, O'Donnell signed the decision documents in docket Nos. 15673-87 and 18551-88; on May 18, 1993, Jones signed the decision document in docket No. 29429-88.  On June 16, 1993, O'Neill signed the Lewises' decision documents on behalf of respondent.  On June 23, 1993, the Court entered the decisions in the Lewises' three dockets.  On September 22, 1993, the decisions became final under section 7481.

The Lius, proceeding pro sese,[17] also accepted the posttrial settlement offer.  On March 10, 1993, the Court entered the

_____

[16]O'Donnell and Jones had entered their appearances on behalf of the Lewises in the present cases on July 6, 1992.

[17]The Lius were represented by Thomas P. Dunn from May 26, 1987, to July 21, 1989.  Their present counsel, Matthew K. Chung, entered his appearance in these proceedings on Oct. 18, 2004, when he filed the Lius' motion for leave to file motion to vacate their stipulated decision.

stipulated decision in the Lius' case, docket No. 48690-86. On June 8, 1993, the decision became final under section 7481.

When respondent submitted the stipulated decision documents obtained through the posttrial settlement offer to the Tax Court and asked the Court to enter those stipulated decisions, respondent did not file a copy of the posttrial settlement offer with the Court.

## VI. Disciplinary Actions Against McWade and Sims

On July 29, 1993, respondent's management sent notices of proposed disciplinary action to McWade and Sims. The notices asserted that McWade and Sims had violated: (1) Department of the Treasury Minimum Standards of Conduct, section 0.735-30(a)(2) (an employee shall avoid any action which might result in or create the appearance of giving preferential treatment to any person); (2) Department of the Treasury Minimum Standards of Conduct, section 0.735-30(a)(6) (an employee shall avoid any action that might adversely affect the confidence of the public in the integrity of the Government); and (3) IRS Rule of Conduct 214.5 (an employee will not intentionally make false or misleading oral or written statements in matters of official interest). The notices proposed to suspend both McWade and Sims for 14 calendar days without pay.

The Notices of Proposed Disciplinary Action to McWade and Sims listed the following reasons for the proposed disciplinary

actions:   (1) Negotiating an unauthorized settlement agreement with the Thompsons; (2) basing the Thompson settlement on unaudited and insufficiently documented losses from an unrelated shelter; (3) allowing the Thompsons a settlement that provided them more favorable treatment than other taxpayers; (4) compensating the Thompsons for their attorney's fees; and (5) not informing the Tax Court of the Thompson settlement arrangements.

McWade and Sims were both suspended for 2 weeks without pay and transferred from the Honolulu Division.  Sims accepted these disciplinary actions and was transferred to the San Francisco Regional Counsel's Office, where he was assigned nonsupervisory duties as a Special Litigation Assistant in the General Litigation area.  Rather than accept a transfer to the Los Angeles District Counsel's office, McWade retired from the IRS, effective October 2, 1993.

On April 1, 1999, the day immediately following the issuance of the Dixon III opinion, we referred the misconduct of Sims, McWade, and DeCastro to the Committee on Admissions, Ethics, and Discipline of the Tax Court.  On April 22, 2003, following the issuance of the Court of Appeals opinion in Dixon V and entry of its primary mandate, the Tax Court, through the Committee on Admissions, Ethics, and Discipline, issued orders to Sims, McWade, and DeCastro to show cause why they should not be

suspended or disbarred from practice before the Court or otherwise further disciplined. On July 1, 2003, DeCastro resigned from practice before the Court.

The Tax Court, acting on the orders to show cause and the recommendations of the Committee on Admissions, Ethics, and Discipline, suspended McWade and Sims from practice before the Court for 2 years, commencing February 20, 2004. The Arkansas State Bar suspended Sims's license to practice law for 1 year in February 2004, and the Oregon State Bar suspended McWade's license to practice for 2 years in August 2004. The Director of the IRS Office of Professional Responsibility suspended McWade and Sims indefinitely from practice before the IRS, effective June 9, 2004.[18]

## VII. Appeals to the Court of Appeals for the Ninth Circuit and Proceedings on Remand

Respondent did not appeal the decisions this Court entered in the Thompson and the Cravens cases in accordance with the secret settlement agreements.[19] As a result, those cases were closed. The remaining test case petitioners, including Rina, appealed the decisions entered in their cases to the Court of

---

[18]Following what Attorney Michael Louis Minns interpreted as a suggestion or order by a member of the panel that heard oral argument on the appeal that resulted in Dixon V, Minns filed the complaints that resulted in the disciplinary actions by the Arkansas and Oregon Bars and the IRS Office of Professional Responsibility.

[19]See the Kane memorandum dated Sept. 8, 1992, supra p. 40.

Appeals for the Ninth Circuit; they included facts about the misconduct of respondent's attorneys as grounds for their appeals, which they characterized as fraud on the court. Additionally, Izen and Sticht separately appealed to the Court of Appeals for the Ninth Circuit our orders denying their motions to intervene in the Thompson and Cravens cases on behalf of various Kersting project nontest case petitioners.[20]

A.  Ninth Circuit Remand: DuFresne v. Commissioner and Adair v. Commissioner

In DuFresne v. Commissioner, 26 F.3d 105 (9th Cir. 1994), the Court of Appeals for the Ninth Circuit vacated the decisions entered against the test case petitioners (other than the Thompsons and Cravenses) on the ground that the misconduct of McWade and Sims required further inquiry.

The Court of Appeals noted that in respondent's motions to vacate decision filed in the Tax Court respondent had "presented a telling case of corruption of the process of the tax court and the rights of both the government and the taxpayers" and that the parties wrongly believed that the test cases were fairly representative of all the other cases and were not sham or collusive proceedings.  The Court of Appeals found that the taxpayers, the Government, and the Tax Court had all been cheated

_____

[20]Izen and Sticht also filed appeals of our orders denying their motions to intervene in the Thompson and Cravens cases in the Courts of Appeals for the Second and Tenth Circuits.  Those appeals were dismissed for procedural reasons and not on the merits.

by the conduct described in the appeal; i.e., that a secret settlement agreement entered into between respondent and the Thompsons was contingent upon the Thompsons' not prevailing in their cases, and that, in effect, the Government agreed to pay the Thompsons' legal fees, and that the Cravenses had entered into a similar agreement. The Court of Appeals also noted that Rina had alleged, in a motion for reconsideration in the Tax Court, that the Thompsons' attorney (who was the main beneficiary of the settlement) was privy, at his insistence, to the test case trial strategy, read counsel's trial notes, and overheard communications with clients.

The Court of Appeals stated that it could not determine from the appellate record "whether the extent of misconduct rises to the level of a structural defect voiding the judgment as fundamentally unfair, or whether, despite the government's misconduct, the judgment can be upheld as harmless error. See Arizona v. Fulminante, 499 U.S. 279, 309 (1991)." Id. at 107.

The Court of Appeals vacated the decisions entered in the remaining test cases and remanded the cases to this Court with directions to hold an evidentiary hearing to determine the full extent of the misconduct of McWade and Sims. The Court of Appeals also directed the Tax Court to consider on the merits all motions of intervention filed by affected parties and stated that all subsequent appeals would be scheduled before the same panel.

In <u>Adair v. Commissioner</u>, 26 F.3d 129 (9th Cir. 1994), an unpublished opinion filed the same day as the <u>DuFresne</u> opinion, the <u>DuFresne</u> panel also dismissed the Kersting project nontest case petitioners' appeals of our orders denying their motions to intervene in the <u>Thompson</u> and <u>Cravens</u> cases.  Notwithstanding (1) the Kersting project nontest case petitioners' allegations that the misconduct of the Government attorneys was a fraud on the Tax Court, (2) the <u>DuFresne</u> panel's conclusions in <u>DuFresne</u> that the process of the Tax Court had been corrupted and that the test case trial was a sham or collusive proceeding, and (3) the holding in <u>Toscano v. Commissioner</u>, 441 F.2d 930, 934 (9th Cir. 1971), vacating 52 T.C. 295 (1969), that the Tax Court has jurisdiction to set aside a final decision where a fraud has been perpetrated on the Court, the <u>DuFresne</u> panel held that the decisions entered in the <u>Cravens</u> and <u>Thompson</u> cases were final and that the Tax Court lacked jurisdiction to vacate them, citing <u>Billingsley v. Commissioner</u>, 868 F.2d 1081, 1084 (9th Cir. 1989).

B.   <u>Evidentiary Hearing and Opinions on DuFresne Remand:</u>
     <u>Dixon III and IV</u>

In May-June 1996 we conducted the evidentiary hearing directed by the Court of Appeals in <u>DuFresne</u>.  To give effect to the directive of the Court of Appeals that the Tax Court consider on the merits all motions of intervention filed by affected parties, we ordered the consolidation of 10 nontest cases, each

represented by Izen, Sticht, or Jones, with the remaining test cases for purposes of the evidentiary hearing.[21]

Shortly before the evidentiary hearing, held in May-June 1996, the parties discovered that decisions entered in the Alexander cases zeroed out the Alexanders' deficiencies for 1974-77.

In Dixon III, filed March 30, 1999, we made detailed findings of fact concerning McWade's and Sims's misconduct during the Kersting test case proceedings. Our ultimate findings included the following.

(1) McWade and Sims negotiated a series of contingent settlement agreements with DeCastro in respect of the Thompsons' tax liabilities in advance of the trial of the test cases. The final Thompson settlement agreement provided for a reduction in the Thompsons' tax liabilities for the purpose of generating refunds to pay DeCastro's attorney's fees.

(2) McWade and Sims negotiated a contingent settlement agreement with John R. Cravens (Cravens) in respect of the Cravenses' tax liabilities in advance of the trial of the test cases. McWade and Sims misled Cravens about the nature and legal

---

[21]The Gridleys and the Fleers, Kersting project nontest case petitioners who were represented by O'Donnell, were originally included in the consolidation for the evidentiary hearing. However, before the hearing, we severed their cases from the consolidation, at O'Donnell's request, so they could independently pursue their summary judgment motions described infra Part VII.C.

effect of his settlement and his need for counsel at the trial of the test cases. In so doing, they foreclosed the possibility that the Cravenses would obtain counsel, thereby reducing the effectiveness of Cravens's testimony and presentations to the Court from the point of view of all test case petitioners. The Cravenses' lack of counsel also reduced the likelihood that they would inform counsel for test case petitioners that their cases had settled.

(3) Before the trial of the test cases, McWade intentionally misled the Court, with the complicity of DeCastro, by not disclosing the settlement of the Thompson cases when he moved to set aside the Thompson piggyback agreements. At the trial of the test cases, Sims, McWade, and DeCastro intentionally misled the Court about the status of the Thompson cases by not disclosing that they had been settled. They intentionally misled the Court in similar fashion about the Cravens cases. McWade allowed Alexander to offer misleading testimony denying that his tax liabilities would be zeroed out in exchange for his testimony and other assistance to McWade.

(4) Izen had no knowledge, before and at the trial of the test cases through the times that the Court issued the Dixon II opinion and entered the initial decisions in the test cases, that the Thompsons and the Cravenses had entered into settlement agreements with McWade. However, DeCastro did not act as a

Government "mole" during the trial of the test cases or convey
any of Izen's trial strategies or confidential information to the
Government.

Having made detailed findings of fact describing the
misconduct of the Government attorneys and DeCastro during the
test case proceedings, we evaluated that misconduct under Arizona
v. Fulminante, 479 U.S. 279, 309-310 (1991), as mandated by the
Court of Appeals, citing Chapman v. California, 386 U.S. 18
(1967), for the proposition that the presence of a structural
defect in a criminal trial requires automatic reversal of the
conviction and a new trial; we held that the misconduct of the
Government attorneys did not create a structural defect that
would invalidate the judgments in the test cases.[22]  We reasoned
that the Thompson and Cravens settlements did not alter the basic

---

[22]In Dixon III, we observed that the term "structural
defect" normally refers to the violation of a fundamental
constitutional right occurring during a criminal trial that
affects the very framework within which the trial proceeds so
that the trial cannot reliably serve its function as a vehicle
for determination of guilt or innocence.  Not all constitutional
errors occurring during a trial result in a structural defect in
the proceedings.  In fact most constitutional errors,
characterized as lesser "trial errors", are amenable to harmless-
error analysis.  A constitutional violation is harmless if it did
not have a "'substantial and injurious effect or influence'" in
determining the jury's verdict.  Rice v. Wood, 77 F.3d 1138, 1144
(9th Cir. 1996) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623
(1993)).  In civil cases an error related to admission of
evidence or attorney misconduct is considered harmless if there
is no prejudicial effect and/or the error did not affect the
judgment.  See Chalmers v. City of Los Angeles, 762 F.2d 753,
761-762 (9th Cir. 1985); see also Mateyko v. Felix, 924 F.2d 824,
827-828 (9th Cir. 1991) (new trial is warranted only if
misconduct affected the verdict).

framework within which the trial of the test cases was conducted and that the outcome of the retrial of the test cases would be the same if we were to order a new trial.

Next we considered the merits of the motions of intervention filed by Kersting project nontest case petitioners whose cases were bound by Dixon II. We concluded that the Government misconduct did not provide any other basis for invalidating the Court's decisions in the remaining test cases or for setting aside the piggyback agreements.

In Dixon III we found that the Kersting project nontest case petitioners who signed piggyback agreements received what they bargained for, an opinion and decisions on the merits in Dixon II. We reviewed the Court's Dixon II opinion and then considered the relative importance of the testimony and evidence of the Thompsons, the Cravenses, and the Alexanders to the Court's holdings in Dixon II. In Dixon II the Court had relied upon substantial objective evidence in concluding that the test case petitioners had no business purpose for entering into the Kersting programs other than tax avoidance and that the transactions lacked economic substance.

In Dixon III we held that the Government misconduct resulted in harmless error in the trial of the test cases insofar as the Court had concluded in Dixon II that: (1) The Kersting transactions were shams; (2) the Kersting promissory notes did

not constitute genuine debt; and (3) interest on Kersting loans was not paid within the meaning of section 163(a).

Because the outcome in the trial of the test cases would not have changed had the Cravens and Thompson cases been removed from the test case array, we concluded that the taxpayers were not entitled to a new trial, concluding that the misconduct resulted in harmless error rather than reversible error. See Arizona v. Fulminante, supra at 307-308; Drobny v. Commissioner, 113 F.3d 670, 678 (7th Cir. 1997), affg. T.C. Memo. 1995-209.

In Dixon III we also held that the Government misconduct in the trial of the test cases did not amount to fraud, misrepresentation, or misconduct under rule 60(b)(3) of the Federal Rules of Civil Procedure or fraud on the Court that would require the Court either to order a new trial or to enter decisions eliminating all tax liability.

In Dixon III we found that the test case petitioners were afforded a fair trial despite the Government misconduct,[23] and therefore justice would not be served if we were to adopt the extraordinary remedy of renouncing the Court's deficiency

---

[23]Although we observed that respondent promptly reported McWade's and Sims's misconduct to the Court upon discovery and that respondent's overall conduct in the proceedings exhibited respondent's institutional good faith, Dixon IV, 79 T.C.M. (CCH) 1803, 1810, 2000 T.C.M. (RIA) par. 2000-116, at 2000-641; Dixon III, 77 T.C.M. (CCH) 1630, 1720, 1999 T.C.M. (RIA) par. 99,101, at 99-652, we had no occasion in the Dixon III and IV proceedings to examine or address the circumstances surrounding respondent's posttrial settlement offer.

determinations in Dixon II, thereby eliminating all tax liability of the taxpayers. Our conclusion that the misconduct was not a fraud on the Court appeared to us to be consistent with the DuFresne panel's holding in Adair v. Commissioner, 26 F.3d 129 (9th Cir. 1994), that the decisions in the Cravens and Thompson cases were final and that the Tax Court lacked jurisdiction to vacate them. Under Ninth Circuit precedent, the Tax Court has jurisdiction to set aside a final decision where a fraud has been perpetrated on the Court. Toscano v. Commissioner, 441 F.2d at 934.

We also concluded that the piggyback agreements executed by Kersting project nontest case petitioners should not be set aside under the theory of fraudulent inducement or for breach of contract.

Although we held in Dixon III that Kersting project test case and nontest case petitioners were not entitled to a new trial or the elimination of all their tax liabilities, we recognized that the misconduct of McWade and Sims had harmed the judicial process, and we found it appropriate to impose sanctions against respondent under Rule 123(a). We held that Kersting project petitioners who either had not had decisions entered in their cases or whose decisions had not yet become final were not liable for the interest component of the addition to tax for

negligence under section 6653(a)(2) or (1)(B) or interest computed at the increased rate prescribed in section 6621(c).

In Dixon IV we imposed additional sanctions pursuant to section 6673(a)(2)(B) by ordering respondent to pay the attorney's fees the Kersting project petitioners had incurred to investigate McWade's and Sims's misconduct and present the evidence of that misconduct to the Court.  We also held that further sanctions against respondent were not warranted to reduce Kersting project petitioners' tax liabilities to match respondent's earlier 20-percent settlement offer.  The remaining test case petitioners (except the Thompsons, the Cravenses, and Rina[24]) and the Kersting project nontest case petitioners who had participated in the evidentiary hearing mandated by DuFresne appealed Dixon III and IV to the Court of Appeals for the Ninth Circuit.

C.   Gridley v. Commissioner

The Gridleys and the Fleers, nontest case Kersting project petitioners who were bound by the outcome of the test cases through piggyback agreements, filed motions for summary judgment that they were entitled to entry of decisions providing for zero deficiencies, consistent with the decision entered in the Thompsons' case for 1979, docket No. 19321-83 (all versions of

---

[24]On June 13, 1995, shortly before the evidentiary hearing on remand from DuFresne, Rina agreed to entry of a stipulated decision in the amounts respondent originally determined in his deficiency notice.

the Thompson settlement applied the burnout to provide a zero

deficiency for 1979, the Thompsons' first taxable year), citing

Estate of Satin v. Commissioner, T.C. Memo. 1994-435, and Fisher

v. Commissioner, T.C. Memo. 1994-434.  We denied their motions in

Gridley v. Commissioner, T.C. Memo. 1997-210.  We distinguished

Estate of Satin and Fisher on the ground that the piggyback

agreements in those cases bound the taxpayers to the resolution

of the test cases "whether by litigation or settlement", whereas

the Gridleys' and Fleers' piggyback agreements did not mention

settlement of the test cases.  The Gridleys and Fleers appealed

to the Court of Appeals for the Ninth Circuit; by mandate dated

May 6, 2003, the Court of Appeals remanded for further

proceedings consistent with Dixon V.[25]

    D.   Dixon V:  Court of Appeals Again Reverses and Remands

Consistent with the concluding statement in DuFresne v.

Commissioner, 26 F.3d at 107, that all subsequent appeals would

be scheduled before the DuFresne panel, the DuFresne panel, on

---

[25]By orders entered July 11, 2000, we had certified the
Gridley and Fleer cases, as well as the cases of nontest case
Kersting project who had participated in the evidentiary hearing,
for interlocutory appeal to the Court of Appeals for the Ninth
Circuit.  The Court of Appeals permitted those appeals.  However,
the Court of Appeals thereafter stayed appellate proceedings in
all the appealed nontest cases, while briefing, argument, and
review of the appeals in the test cases went forward.  After its
Dixon V opinion, the Court of Appeals, recognizing that the
Gridley and Fleer cases were related to the Dixon cases and the
other nontest cases, remanded the Gridley and Fleer cases and the
other nontest cases to this Court for further proceedings
consistent with Dixon V.

November 21, 2001, set the original briefing schedule for the appeals of Dixon III and IV and received the opening and reply briefs. On July 29, 2002, the DuFresne panel issued an order that "Upon reconsideration of the original panel that heard this matter will not retain jurisdiction of any subsequent appeals. Accordingly, the Clerk of the court is hereby directed to schedule the current appeal in the normal course of events". The appeals were assigned to a new panel of the Court of Appeals for the Ninth Circuit (the Dixon V panel), which heard oral arguments.

On January 17, 2003, the Dixon V panel issued Dixon V (amended March 18, 2003), vacating and remanding the Tax Court's decisions in the remaining test cases. Dixon v. Commissioner, 316 F.3d 1041 (9th Cir. 2003). The Court of Appeals held we had applied the wrong law in Dixon III[26] and held the misconduct of McWade and Sims was a fraud on both the Kersting project petitioners and the Tax Court, "a fraud, plainly designed to corrupt the legitimacy of the truth-seeking process". Id. at 1046. "Fraud on the court occurs when the misconduct harms the integrity of the judicial process, regardless of whether the opposing party is prejudiced." Id. (citing Alexander v. Robertson, 882 F.2d 421, 424 (9th Cir. 1989)). The Court of

---

[26]Dixon V distinguished and held inapplicable the contrary decision of the Court of Appeals for the Seventh Circuit in Drobny v. Commissioner, 113 F.3d 670, 678 (7th Cir. 1997).

Appeals held that the fraud not only defiled the sanctity of the
Court and the confidence of all future litigants, but also
violated the rights of more than 1,300 Kersting project
petitioners who had agreed to be bound by the outcome of the test
cases.  Id. at 1047.

Rather than ordering a new trial or entering decisions
eliminating all tax liabilities of the Kersting project
petitioners, the Court of Appeals directed that terms equivalent
to those provided in the Thompson settlement agreement be
extended to "Appellants and all other taxpayers properly before
this Court".[27]  Id.  The Court of Appeals left to the Tax Court's
discretion "the fashioning of such judgments which, to the extent
possible and practicable, should put these taxpayers in the same
position as provided for in the Thompson settlement."  Id. n.11.

On January 17, 2003, the same day as its original Dixon V
opinion, the Court of Appeals filed its primary mandate,
reversing and remanding with directions.  On May 28, 2003, the
Court of Appeals, acting through the Dixon V panel, filed a
supplemental mandate sending the test case petitioners' appellate
fee requests to the Tax Court for a determination of entitlement

_____

[27]In setting forth the factual background and procedural
history of the Kersting project, the Court of Appeals noted
without comment that several hundred taxpayers had settled their
cases.  Dixon V at 1043.

and, if warranted, amount.[28]  The supplemental mandate also stated that the Dixon V panel "retains jurisdiction over all further proceedings that may arise".

    E.    <u>Responses to Dixon V by the Office of Chief Counsel</u>

On January 21, 2003, at the annual meeting of the New York State Bar Association Tax Section, then IRS Chief Counsel B. John Williams (Williams) spoke about the role of the professional adviser in preserving the public's confidence in our tax system. See B. John Williams, Jr., Chief Counsel, Internal Revenue Service, Remarks at the Meeting of the New York State Bar Association Tax Section (Jan. 21, 2003), in 2003 TNT 15-20, excerpts from which are set forth in appendix A.  Williams said that he expected attorneys in the Office of Chief Counsel to adhere to the highest professional standards.  He discussed the fraud committed on the Tax Court in the Kersting test case proceedings and his endorsement of the opinion and mandate of the Court of Appeals in Dixon V.  He announced that the Office of Chief Counsel would "expeditiously implement the Ninth Circuit's mandate to extend to all affected taxpayers the terms of the settlement that were effected in the lead test case.  We will also assure that no interest is charged on deficiencies for the period of the appeals to the Ninth Circuit."  <u>Id.</u>

---

    [28]See <u>supra</u> note 3.

Williams acknowledged that the goal of IRS attorneys cannot be to collect the most revenue for the Government or to win cases at all costs.  Rather, the goal is to ensure that the tax system is administered fairly and impartially.  He recognized that "confidence in the integrity and fairness of the tax system is vital to our democracy.  The tax system touches more people in this country than any other part of the government or our laws.  The loss of confidence in its integrity is the loss of confidence in the government itself."  Id.

On February 3, 2003, Deborah Butler, IRS Associate Chief Counsel for Procedure and Administration, issued Chief Counsel Notice CC-2003-008 (excerpts set forth in appendix B), reminding all Chief Counsel attorneys, in the light of the opinion of the Court of Appeals in Dixon V, of their obligation to adhere to the highest ethical standards when performing their duties, including representing the IRS before the Tax Court.  The notice reminded Chief Counsel attorneys that their role is to ensure the uniform application of the tax laws and the fair disposition of cases and that, as officers of the court, they have a special duty to avoid conduct that undermines the integrity of the adjudicative process.  Chief Counsel attorneys must ensure that their actions (or failure to act) preserve the sanctity of the court and safeguard the public's confidence in the judicial process.  Id.

The notice explained that Chief Counsel attorneys must conduct their activities in accordance with the letter and spirit of the Model Rules of Professional Conduct of the American Bar Association (ABA Model Rules). The notice specifically discussed ABA Model Rules 4.1 and 8.4. ABA Model Rule 4.1 provides in part that in the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person, or fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited under ABA Model Rule 1.6 regarding client-lawyer confidentiality. It is also professional misconduct under ABA Model Rule 8.4 for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation or to engage in conduct that is prejudicial to the administration of justice.

The notice concluded: "All Chief Counsel attorneys are expected to carry out their responsibilities with the utmost integrity. Clearly, the conduct of the Chief Counsel attorneys in <u>Dixon</u> fell far short of those high standards." CC-2003-008.

F. <u>Determination on Remand of Terms of the Thompson Settlement by Dixon VI and VIII</u>

Our Dixon VI opinion responded to the directions of the Dixon V opinion and primary mandate to determine how the Thompson settlement would be imposed against respondent in favor of the test case petitioners and all parties properly before the Court.

In Dixon VI, we held that: (1) The final Thompson settlement is to be regarded as resulting in a 63.37-percent reduction of the Thompsons' deficiencies, as well as elimination of all Kersting-related penalties and additions; (2) the Thompson settlement encompasses and requires the vacating of the portion or portions of the deficiencies determined against any Kersting project petitioners that may be attributable to the "Bauspar" shelter that was also promoted by Kersting; (3) the Thompson settlement's cancellation of the Thompsons' 1981 late-filing addition justifies cancellation of not only all non-Kersting-related penalties and additions but also all other substantive adjustments not arising from shelters promoted by Kersting; (4) interest on the reduced deficiencies shall not be charged beyond the date in June 1992 fixed by respondent's concession.[29]

_____

[29]Respondent conceded that the accrual of interest on Kersting project deficiencies ultimately determined by this Court should be tolled as of June 1992, in accordance with the Jan. 21, 2003 public announcement of then IRS Chief Counsel B. John Williams. In a speech on that date at the annual meeting of the New York State Bar Association Tax Section, Williams assured the public that no interest would be charged on Kersting project deficiencies for the period of the appeals. As indicated by Dixon VI n.30: "The original decisions in Dixon II were entered Mar. 13, 1992; the [original] notices of appeal were filed May 14, 1992; the 90-day appeal period would have expired June 11, 1992." Stipulated decisions and decisions entered under Rule 155 following Dixon VI and VIII provide that "No interest shall accrue [on deficiencies] during the period from May 14, 1992, through the date that is 90 days after the decision in this case is entered." Motions are pending before the Tax Court in 16 cases of Kersting project nontest case petitioners with

(continued...)

Respondent and the Kersting project petitioners had agreed in a stipulation of settled issues that the relief extended to all docketed cases in the Kersting project remaining open, whether or not the Kersting project petitioners had signed piggyback agreements.[30]

In Dixon VIII we denied the motion of the Hongsermeier test case petitioners for reconsideration of Dixon VI. The Hongermeiers alleged that respondent engaged in attempts at a continued coverup of the fraud of respondent's attorneys, and they asked the Court to impose additional sanctions on respondent for respondent's alleged continued misconduct.[31] The alleged

_____

[29](...continued)
deficiencies, as of Sept. 13, 2007, in cases in which decisions giving effect to the Thompson settlement have not yet been entered, to stop further accrual of interest on their deficiencies after Sept. 13, 2007.

[30]Dixon VI, 91 T.C.M. (CCH) at 1107, 2006 T.C.M. (RIA) par. 2006-090, at 2006-671.

[31]Kersting project petitioners who settled their cases and have filed motions for leave to file motions to vacate (see Part VIII infra) make similar allegations. They ask the Court to conduct an evidentiary hearing to determine whether, following the trial of the test cases, the conduct of respondent's management related to the posttrial settlement offer continued the fraud on the Court (or constituted a new fraud on the Court) and, if the Court so finds, to impose the Dixon V sanction on respondent for that conduct. Another evidentiary hearing is unnecessary because of our holding herein that the fraud committed on the Court by respondent's counsel during the test case proceeding was a fraud on the Court in the case of every Kersting project petitioner who was bound by the test cases and that the Dixon V sanction is to be imposed against respondent in each such case. We impose sanctions in all cases where decisions
(continued...)

misconduct of respondent's managers following the trial of the test cases was directly in issue in the prior proceedings before this Court in the DuFrense remand and before the Court of Appeals in the Dixon V appeal. We therefore held that the issue of any continuing misconduct was covered by necessary implication by the opinion of the Court of Appeals in Dixon V and by its most recent primary mandate. In Dixon VIII, we concluded that the law of the case and the primary mandate of the Court of Appeals in Dixon V precluded us from conducting any further inquiry into respondent's misconduct and from imposing any additional sanction on respondent with respect to cases of Kersting project petitioners who were properly before the Court of Appeals.

The Hongsermeiers (represented by Minns) and Kersting project petitioners in 12 other test and nontest cases (represented by Izen and Sticht) have appealed to the Court of Appeals for the Ninth Circuit our decisions giving effect to the Thompson settlement sanctions as formulated in our Dixon VI and VIII opinions.

In Dixon VII and Young v. Commissioner, T.C. Memo. 2006-189, we responded to the Dixon V supplemental mandate with regard to Kersting project petitioners' appellate attorney's fees and costs incurred in Dixon V. We have determined that both test case and

---

[31](...continued)
were entered on or after June 10, 1985, the date the Court agreed to use the test case procedure in the Kersting project cases.

nontest case Kersting project petitioners represented by various counsel are entitled to appellate attorney's fees and have determined the amounts of those fees.

The Court now has under consideration various Kersting project petitioners' applications for post Dixon V attorney's fees and costs incurred in the Dixon V remand proceedings.

VIII.   Motions To Vacate

In 71 of the more than 500 Kersting-related nontest cases in which stipulated decisions were entered both before and after respondent's discovery and disclosure to the Court of McWade's and Sims's misconduct, Kersting project petitioners have filed motions for leave to file motions to vacate the decisions. Petitioners and the other Kersting project petitioners filing or attempting[32] to file such motions seek new decisions reflecting the benefits of the Thompson settlement as mandated by the Court of Appeals in Dixon V.  The Lewises, in their motions, ask us to vacate their stipulated decisions so they can "participate in the benefits to be generated by the subsequent proceedings mandated by the Court of Appeals in Dixon V".  In Lewis v. Commissioner, T.C. Memo. 2005-205, we denied the Lewises' motions for leave to file motions to vacate stipulated decisions.

In Lewis, we focused on the legal consequences of the Lewises' acceptance of respondent's posttrial settlement offer,

_____

[32]The Court has returned unfiled numerous other such motions because of procedural defects.

applying general principles of contract law.  We found that the
Lewises, who settled after respondent disclosed the secret
settlements to the Court, abandoned any opportunity to benefit
from the mandate of the Court of Appeals in Dixon V, issued 10
years after respondent's posttrial settlement offer.  We found
that knowledge of the Lewises and their counsel of the secret
settlements and allegations of fraud on the Court made in the
appeals of Dixon II filed in the Court of Appeals for the Ninth
Circuit precluded a claim of fraud and that, by settling as they
did, the Lewises assumed the risk that, as a result of the then-
pending appeals, other Kersting project petitioners might become
entitled to a more favorable outcome.

The Lewises timely filed motions for reconsideration.  We
now believe that we applied the wrong law in Lewis, as the Court
of Appeals in Dixon V held we did in Dixon III and IV, and that
we failed to appreciate and apply the full scope of the holding
of Dixon V in accordance with its rationale.  We have therefore
granted the Lewises' motions for reconsideration, granted the
motions for leave in the Lewis, Hartman, and Liu cases, and
consolidated them for the purpose of this opinion, in which we
hold that the underlying motions to vacate should be granted.

## Discussion

I.  Preliminary Comments

Respondent, Kersting project petitioners, the opinion-reading public, and the Court of Appeals for the Ninth Circuit might well consider this opinion a surprising about-face from our opinion in Lewis v. Commissioner, supra.  We therefore indicate some of the considerations that have led to our change of position.

Hartman's and the Lius' motions for leave to vacate and the Lewises' motions for reconsideration led us to reread the Dixon V opinion.  Our rereading prompted us to compare the different situations of the 400-500 settling Kersting project petitioners, who at various times were induced to agree to entry of stipulated decisions, with the situations of the more than 1,300 nonsettling petitioners who have delayed entry of decisions in their cases through the appeal process in the Court of Appeals for the Ninth Circuit.[33]

_____

[33]These more than 1,300 Kersting project petitioners have sorted into three groups:  (1) Those who, after issuance of our opinions in Dixon VI and VIII responding to the mandate of Dixon V to determine and apply the Thompson settlement to the Kersting project cases, have agreed to entry of stipulated decisions in accordance with our opinions in Dixon VI and VIII and waived their appeal rights; (2) those who have had decisions entered in accordance with the terms of the Thompson settlement as determined by our opinions in Dixon VI and VIII, and have filed appeals to the Court of Appeals for the Ninth Circuit; and (3) those who continue to await the final outcome of those test cases that have been appealed to the Court of Appeals for the Ninth Circuit.  We assume that all Kersting project test cases and

(continued...)

The observation of the Court of Appeals in Dixon V that the misconduct of respondent's attorneys violated the rights of all petitioner participants in the Kersting project to a fair trial of the test cases brought home to us more keenly than we had previously appreciated that our <u>Lewis</u> opinion would result in disparate treatment of those who have agreed to entry of stipulated decisions at various times along the way, as compared with those who have awaited the final outcome. We had a visceral reaction that our <u>Lewis</u> opinion violated some sense of distributive justice,[34] whether derived from notions of equality[35] or of fairness,[36] and that the Dixon V opinion and mandate required a contrary result. Recognizing the incompatibility of the various formulations of distributive justice by political philosophers over the years,[37] we mention those formulations as no

---

[33](...continued)
nontest cases on appeal to the Court of Appeals for the Ninth Circuit will be reviewed by the panel that issued the opinion in Dixon V. See <u>supra</u> note 5 and accompanying text.

[34]See Aristotle, "Nichomachean Ethics", bk. V, chs. 2 and 3, Introduction to Aristotle (Richard McKeon, ed., Modern Library 1947). Aristotle's original formulation of distributive justice in terms of the relative merits or virtuousness of the individuals among whom goods are to be apportioned might be deemed to be more in line with our opinion in <u>Lewis</u>, than the more recent formulations mentioned <u>infra</u> notes 35 and 36.

[35]See Hobbes, Leviathan (1651), ch. xv, at 208 (Pelican Classics 1968).

[36]See Rawls, A Theory of Justice (rev. ed. 1999).

[37]See MacIntyre, After Virtue, 246-257 (2d ed. 1984).

more than intimations that we should reconsider our <u>Lewis</u>
position in the light of our rereading of the Dixon V opinion.
Those intimations have led us to reflect on the various
situations of those Kersting project petitioners who were part of
the test case proceedings and who agreed to entry of stipulated
decisions at different times along the way after the test case
proceedings began.[38]

First, there are Kersting project petitioners who settled
with respondent before the misconduct had begun or who, like
Hartman, settled after the misconduct had begun but before the
Court issued Dixon II and before respondent's management
discovered the misconduct and disclosed it to the Court.  Such
petitioners, irrespective of whether they had concluded that
their position on the merits was well-nigh hopeless or had some
chance of success, were entitled to assume that the test cases
whose outcome would determine the tax effects of the Kersting
programs would be well and fairly tried.  That assumption was
defeated by McWade's and Sims's intervening misconduct.

Second, there is a small group of Kersting project
petitioners who agreed to entry of stipulated decisions during
what respondent calls the "gap period", after the Court issued

---

[38]Any Kersting project taxpayers who settled with respondent
before the Court agreed to use the test case procedure in
resolving the bulk of the Kersting project cases were not part of
the test case proceedings.  Those taxpayers were not affected by
the fraud on the Court, and sanctions are not warranted in their
cases.

Dixon II and before respondent's management discovered the misconduct and disclosed it to the Court. Respondent has conceded that Kersting project petitioners in this category are entitled to have their stipulated decisions vacated so they can avail themselves of the benefits of the Thompson settlement.[39]

Third, there were Kersting project petitioners, such as the Lius and the Lewises, who accepted the reinstated project settlement offer after respondent had disclosed the misconduct to the Court, and who, actually or through counsel, had or may have become aware of the Cravens and Thompson settlements and of the pending appeals. However, they may well have been discouraged by the Court's denial of respondent's motion for an evidentiary hearing and his conclusion that the misconduct had not affected the outcome of the test cases. They may have been disheartened

---

[39]Respondent has made this concession on the record in Kahle v. Commissioner, docket Nos. 24558-84 and 38976-84, cases in which stipulated decisions conceding respondent's adjustments in full were entered in the "gap period" with respect to which petitioner has filed motions for leave to file motions to vacate. On Oct. 2, 1991, Terrence Kahle (Kahle), proceeding pro se, contacted McWade conceding the Kersting issues and requesting that McWade send decision documents. McWade sent decision documents to Kahle on Oct. 9, 1991, and Kahle signed them on Dec. 20, 1991, 9 days after the Court published Dixon II. The decisions in Kahle's cases were entered on Jan. 6, 1992, and became final before respondent discovered the misconduct of McWade and Sims and disclosed it to the Court. On Feb. 24, 1994, respondent administratively abated Kahle's deficiencies and additions and attempted to give him the benefit of the 7-percent reduction of the posttrial settlement offer. Respondent has conceded that the stipulated decisions entered in Kahle's cases and any other stipulated decisions entered during the gap period should be vacated and new decisions entered in accordance with Dixon VI.

by the Court's apparent failure to appreciate or consider that McWade's and Sims's conduct was unethical and fraudulent and puzzled by respondent's failure to appeal the <u>Thompson</u> and <u>Cravens</u> decisions. Again, they were probably further discouraged by our denials of the timely motions to intervene filed in the <u>Thompson</u> and <u>Cravens</u> cases by Attorneys Sticht and Izen on behalf of their nontest case petitioner clients.

These developments were soon followed by respondent's reinstatement of the lowball nuisance value project settlement offer, an offer that intentionally did not disclose that it was much less favorable to Kersting project petitioners than the final secret Thompson settlement and failed to disclose and acknowledge to the public that the settlement and its having been kept secret were improper, much less admit the dimensions and seriousness of the intervening misconduct. Although the offer stated that the Court had decided that the settlements did not change the results in Dixon II, it failed to acknowledge that Dixon II was being appealed. The offer also failed to acknowledge that allowing the Thompsons a settlement that provided them more favorable treatment than other taxpayers and compensating the Thompsons for their attorney's fees violated IRS policy and the Department of the Treasury Minimum Standards of Conduct. While the offer claimed it was being made in fairness to Kersting project petitioners, acceptance of the offer continued and confirmed the disparate treatment of the accepting

petitioners in comparison to both the Thompsons and the Chicoine and Hallett and DeCastro clients who had obtained 20-percent reduction settlements.

The reinstated offer was merely an attempt at damage control; it did not purge the fraud that besmirched every case that was part of the Kersting project test case proceedings; it did not mitigate the harm caused by that fraud. The offer left the Lius, the Lewises, and more than 400 other Kersting project petitioners with the overwhelming impression that, realistically speaking, respondent's lowball nuisance value reinstated project settlement offer was the only game in town, and that it was generous because in all likelihood the adverse decisions against the test case petitioners would be sustained on appeal.[40]

This impression was confirmed by the opinion of the Court of Appeals on the first appeal in DuFresne v. Commissioner, 26 F.3d 105 (9th Cir. 1994), which seemed to ignore the fraud on the court arguments made to it by Attorney Izen--even as it remanded for an evidentiary hearing to determine the extent of the

_____

[40]Our pejorative characterization of respondent's reinstatement of the project settlement offer following the misconduct of respondent's attorneys in the Kersting test cases should not be seen as the Court's view of the Commissioner's use of such an offer to settle cases in other tax shelter projects where, in the Commissioner's view, the shelter lacks merit. It is not the province of the courts to second-guess the Commissioner's exercise of professional judgment in doing his job. See United States v. Payner, 447 U.S. 727, 737 (1980) (Burger, C.J., concurring) (Supreme Court has no general supervisory authority over executive branch operations).

misconduct--by couching the analysis in terms of structural defect versus harmless error.  The same panel, in its unpublished opinion in Adair v. Commissioner, 26 F.3d 129 (9th Cir. 1994), affirming our denial of Sticht's and Izen's motions for intervention in the Thompson and Cravens cases, appeared to ignore the possibility of fraud on the court when it held that the Thompson and Cravens decisions had become final; this would not have been so had the panel recognized that the misconduct might have been a fraud on the court.  See Toscano v. Commissioner, 441 F.2d at 934.  In the same vein, our opinions in Dixon III and IV responded to the mandate of DuFresne by applying traditional harmless error analysis to hold that the misconduct of respondent's attorneys did not entitle the test case petitioners (and, by extension, all Kersting project petitioners) to any substantial relief other than remission of additions and awards of attorney's fees.  Dixon V held that our focus on harmless error analysis was wrong at every turn.

The foregoing observations have also led us to consider the career of Justice Holmes's famous dictum:  "Men must turn square corners when they deal with the Government."  Rock Island, Ark. & La. R.R. Co. v. United States, 254 U.S. 141, 143 (1920).  The phrase originated in a tax refund case holding that taxpayers must comply with even formal statutory conditions to the Government's consent to be sued; its subsequent invocations have led to judicial recognition of the correlative proposition that

Government officials have some minimum substantive obligations to the citizens they have been hired to serve.  Even as the Supreme Court continued strictly to limit claims of estoppel against the Government, it recognized that citizens have an interest in "some minimum standard of decency, honor, and reliability in their dealings with their Government", see Heckler v. Comty. Health Servs., Inc., 467 U.S. 51, 61 (1984); that "when the Government acts in misleading ways, it may not enforce the law if to do so would harm a private party as a result of governmental deception", id. n.12 (citing United States v. Pa. Indus. Chem. Corp., 411 U.S. 655, 670-675 (1973), and Moser v. United States, 341 U.S. 41 (1951)); and that "'Men naturally trust in their government, and ought to do so, and they ought not to suffer for it'", id. n.13 (quoting Menges v. Dentler, 33 Pa. 495, 500 (1859)).  These usages were preceded by observations in dissent that "there is no reason why the square corners should constitute a one-way street", FCIC v. Merrill, 332 U.S. 380, 387-388 (1947) (Jackson, J., dissenting), and "It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their Government", St. Regis Paper Co. v. United States, 368 U.S. 208, 229 (1961) (Black, J., dissenting), that have more recently been quoted in support of deciding a claim against the Government, see United States v. Winstar Corp., 518 U.S. 839, 886 n.31 (1996);  see also Commissioner v. Lester,

366 U.S. 299, 306 (1961) (Douglas, J., concurring) ("The revenue laws have become so complicated and intricate that * * * the Government in moving against the citizen should also turn square corners.").

To quote from former Chief Counsel Williams's address to the annual meeting of the New York State Bar Association Tax Section in January 2003 (appendix A):

> The public's confidence in our tax system rests, in significant part, on their perception of fairness in the administration of the tax laws.  This begins with government first. * * * Fraud on any court is, in my view, not only pernicious to the fair resolution of the particular case, but also threatening to fundamental democratic principles.  As an institution, the Office of Chief Counsel must adhere to the highest standards of conduct not simply conform to minimum professional obligations.

As the Court of Appeals for the Ninth Circuit said in Brandt v. Hickel, 427 F.2d 53, 57 (9th Cir. 1970) (also quoted in Heckler v. Comty. Health Servs., Inc., supra at 61 n.13), "To say to these appellants, 'The joke is on you.  You shouldn't have trusted us,' is hardly worthy of our great Government."  To tell Kersting project petitioners they should not have trusted respondent to try the test cases honestly and fairly and the Tax Court to formulate an appropriate sanction when respondent failed to do so would be equally unworthy.

In Dixon V, the Court of Appeals held that the fraud on the Court committed by McWade and Sims during the Kersting test case proceedings violated the rights of all Kersting project

petitioners "who agreed to be bound by the outcome of the Tax Court proceeding". Despite the foregoing catalog of missed opportunities, it is not too late to rectify our errors. "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." Henslee v. Union Planters Natl. Bank & Trust Co., 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting). Having responded in Dixon VI and VIII to the primary mandate of the Court of Appeals in Dixon V by fixing the terms of the Thompson settlement that define the sanctions and relief to which nonsettling Kersting project petitioners in more than 1,300 dockets have become entitled, we hold that Kersting project petitioners in the cases at hand and in more than 400 other dockets who agreed to entry of stipulated decisions are entitled to the same sanctions and relief.

II. Analysis

We begin by reviewing the extent of the fraud committed on the Court, the harm done thereby, and the sanction mandated by the Court of Appeals in Dixon V to rectify the harm. Second, we reconsider Lewis v. Commissioner, T.C. Memo. 2005-205, by applying to the cases at hand the findings, rationale, and holding of the Court of Appeals in Dixon V. Third, we explain why respondent's posttrial disclosure of McWade's and Sims's misconduct did not purge the fraud from the test case proceedings. Fourth, we identify respondent's obligations to the Kersting project petitioners bound by the test cases and explain

why respondent's posttrial settlement offer did not satisfy those obligations. Fifth, we explain why respondent's posttrial settlement offer (1) did not rectify the harm caused by the fraud committed on the Court and (2) does not otherwise preclude this Court from imposing sanctions for that fraud in cases of Kersting project petitioners who accepted the offer. Finally, we formulate and prescribe a plan for expeditious implementation of the sanctions and relief in all closed cases where stipulated decisions were entered before we issued our Dixon VI and VIII opinions.

A.   The Fraud on the Court Committed by Respondent's Attorneys, the Harm Done Thereby, and the Sanction Mandated by the Court of Appeals

In Dixon V at 1045, the Court of Appeals for the Ninth Circuit held that the misconduct of McWade and Sims during the test case proceedings, including its persistence and concealment, was a fraud on the Tax Court. "Fraud on the court occurs when the misconduct harms the integrity of the judicial process, regardless of whether the opposing party is prejudiced." Id. at 1046 (citing Alexander v. Robertson, 882 F.2d at 424).

McWade and Sims perpetrated a fraud on the Court that harmed the integrity of the judicial process. That judicial process was the test case procedure that the parties, with the Tax Court's participation and encouragement, invoked in their efforts to resolve the more than 1,800 cases arising from respondent's

disallowance of deductions claimed by participants in the Kersting programs.

When the Court, taxpayers, and the IRS agree to employ the test case procedure, the taxpayers whose cases are bound (whether by piggyback agreement or the Court's order to show cause procedure) by the outcome of the test cases expect (and have a right to do so) that the test cases will be well and fairly tried. The fraud on the Court committed by McWade and Sims in the Kersting project test cases violated the rights of all Kersting project petitioners who were bound by the outcome of the test case proceedings and betrayed the confidence of all future litigants in the test case procedure. Id. at 1047. The test case procedure is a valuable judicial procedure, and, as the Court of Appeals recognized, the continued viability of that procedure requires the confidence of all future litigants.

The fraud on the Court committed by respondent's attorneys in the Kersting project test cases violated the rights of not only the test case petitioners but every petitioner whose case was bound by the outcome of the test cases. The fraud committed by McWade and Sims was a fraud on the Court in every one of those cases.

The appropriate sanction against respondent for the fraud committed on the Court by McWade and Sims should remedy the harm done to the judicial process, restore public confidence in the test case proceedings, rectify the violation of the rights of the

Kersting project petitioners whose cases were bound by the
outcome of the test cases, and deter future violations by the
offending party.  After expressing indignation at the odiousness
of the Government attorneys' misconduct and the Tax Court's
repeated failures to "get it right", the Court of Appeals
formulated and mandated an intermediate sanction that provides
both an appropriate remedy for the violation of the rights of
Kersting project petitioners and an effective deterrent to
further misconduct by Government attorneys.  Holding the limited
sanctions we initially imposed in Dixon III and IV to be grossly
inadequate, but recognizing that the power to sanction is to be
"'exercised with restraint and discretion'", Dixon V at 1047
(quoting Roadway Express, Inc. v. Piper, 447 U.S. 752, 764
(1980)), the Court of Appeals held that it would be inappropriate
to force the taxpayers to endure a remand for a trial on the
merits,[41] but also declined to enter judgment eradicating all tax
liability of the Kersting project petitioners--"Such an extreme
sanction, while within the court's power, is not warranted under
these facts."  Id. at 1047 (citing Chambers v. NASCO, Inc., 501
U.S. 32, 45 (1991)).

The Court of Appeals recognized that the fraud on the court
committed by respondent's attorneys in the Kersting project test
cases was a fraud on the court in every case bound by the outcome

---

[41]Which the taxpayers would inevitably have lost.

of the test cases and sanctioned respondent in each of those cases before the Court of Appeals. The Court of Appeals held that the appropriate remedy to be applied to all Kersting project petitioners who were bound by the test cases (test case and nontest case petitioners alike) properly before it was to enter decisions that put them, as nearly as possible, in the same position as provided for in the Thompson settlement. Id. at 1047 n.11. Putting every Kersting project petitioner (test case and nontest case petitioners alike) whose cases were part of the test case proceedings in the same position as provided for in the Thompson settlement is the appropriate remedy for the violation of their rights and the sanction that should have the necessary deterrent effect.

We have granted petitioners leave to file and petitioners have filed motions to vacate the stipulated decisions entered in their cases. In effect, they have asked the Court to impose on respondent in their cases the sanction mandated by the Court of Appeals in Dixon V. Motions in this Court to vacate or revise a decision are covered by Rule 162, which provides: "Any motion to vacate or revise a decision, with or without a new or further trial, shall be filed within 30 days after the decision has been entered, unless the Court shall otherwise permit." Rule 162 provides no guidance as to when this Court will grant leave to file a motion to vacate more than 30 days after a decision is

entered or, more importantly, when this Court will grant a motion to vacate.

A stipulated decision falls within the purview of Rule 91(a), which requires parties to stipulate "all matters not privileged which are relevant to the pending case, regardless of whether such matters involve fact or opinion or the application of law to fact." The stipulation process has broad scope and is not confined to the stipulation of facts or evidence. Willamette Indus., Inc. v. Commissioner, T.C. Memo. 1995-150 (citing Explanatory Note to Rule 91(a), 60 T.C. 1118). "The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires." Rule 91(e) (emphasis added). Where Rule 91(e) applies, the Tax Court must proceed in accordance with the provisions of that Rule. Farrell v. Commissioner, 136 F.3d 889, 893-897 (2d Cir. 1998), revg. and vacating Spears v. Commissioner, T.C. Memo. 1996-341. The Court is reluctant to set aside a stipulated decision in absence of fraud, mutual mistake of fact, or other like cause. MacElvain v. Commissioner, T.C. Memo. 1987-366 (citing Saigh v. Commissioner, 26 T.C. 171, 176 (1956), and Estate of Jones v. Commissioner, T.C. Memo. 1984-53, affd. 795 F.2d 566 (6th Cir. 1986)).

When a taxpayer files a motion to vacate a decision after it has become final, our authority to vacate the decision, though limited, may be exercised in situations where the taxpayers

establish the existence of a fraud on the Court.  <u>Cinema '84 v. Commissioner</u>, 122 T.C. 264, 270 (2004).  Fraud on the Court is a fraud that harms the integrity of the judicial process. <u>Standard Oil Co. of Cal. v. United States</u>, 429 U.S. 17 (1976); <u>Hazel-Atlas Glass Co. v. Hartford-Empire Co.</u>, 322 U.S. 238, 245 (1944).  Fraud on the court includes any unconscionable plan or scheme that is designed to improperly influence the court in its decision.  <u>Abatti v. Commissioner</u>, 859 F.2d 115, 118-119 (9th Cir. 1988), affg. 86 T.C. 1319 (1986).  The limited definition of fraud on the Court reflects the policy of putting an end to litigation and serves the important legal and social interest in preserving the finality of judgments.  <u>Toscano v. Commissioner</u>, 441 F.2d at 934.

Recognizing that the fraud on the Court committed by respondent's trial attorneys (1) was a fraud on the Court in every Kersting project case that was bound by the test case cases and (2) violated the rights of all Kersting project petitioners in those cases, we are convinced that justice will best be served by vacating the stipulated decisions and imposing on respondent the sanction mandated by the Court of Appeals in Dixon V.

Respondent's position in these cases is that Kersting project petitioners are not entitled to the benefit of the final Thompson settlement unless they can directly connect conduct amounting to fraud on the Court to the decisions entered in their cases.  Respondent does not object to vacating the decisions in

nontest cases that were entered after December 11, 1991, the date the Court filed its Dixon II opinion, and before June 9, 1992, the date respondent disclosed the misconduct of McWade and Sims to the Court in the motions to vacate the decisions in the Thompson, Cravens, and Rina test cases. Respondent concedes that decisions in Kersting project cases that were entered during that "gap period" (see supra note 39 and accompanying text) were obtained by fraud on the Court and that decisions in those cases should be vacated. Respondent agrees that taxpayers who agreed to stipulated decisions "in possible reliance on Dixon II and in apparent ignorance of the misconduct in the test cases" are entitled to have their decisions vacated because of the fraud on the Court.

Respondent objects to vacating stipulated decisions in these and other Kersting project cases that were entered before the publication of Dixon II (such as the Hartman cases) or after the discovery and disclosure to the Court of the misconduct of respondent's attorneys (such as the Lewis and the Liu cases). Respondent objects to vacating decisions entered in these and other similar cases on the ground that the misconduct of McWade and Sims had no influence on those petitioners' decisions to settle their cases.

Respondent contends that before Dixon II was issued no one knew with absolute certainty how the Court would rule on the merits of the Kersting programs and that implicit in prior

decisions to settle was petitioners' belief that "they would lose under a fairly tried case". In our view, petitioners, irrespective of whether they had concluded that their position on the merits was well-nigh hopeless or had some chance of success, were entitled to assume that the test cases whose outcome would determine the tax effects of the Kersting programs would be well and fairly tried. That assumption was defeated by McWade's and Sims's intervening misconduct.

Respondent contends that Kersting project petitioners such as Hartman decided to settle independently of, and without any possible attribution to, the misconduct that constituted a fraud on the Court. Respondent's attempt to impose the conditions that there be a direct causal link between the fraud committed on the Court and petitioners' decisions to settle their cases, that petitioners must not have known of the secret settlements, and that petitioners need to have relied on the Court's Dixon II opinion cannot be sustained. Imposing those conditions would require petitioners and every other Kersting project petitioner bound by Dixon II to show prejudice. The Court of Appeals made it clear in Dixon V that entitlement to relief from a fraud on the court does not require a showing of prejudice.

With respect to Kersting project petitioners such as the Lewises and the Lius, respondent contends that the holding of the Court of Appeals in Dixon V that McWade and Sims had perpetrated a fraud on the Court "was directed at the improper settlement

arrangement with the Thompsons as it related to the 1989 test case trial. It had nothing to do with settlements of cases subsequent to the discovery and public disclosure by respondent of that improper conduct."

Respondent's contention ignores the holding of the Court of Appeals that McWade's and Sims's misconduct violated the rights of all Kersting project petitioners who were bound by the outcome of the Tax Court proceeding and the need to impose a sanction providing a remedy for those violations. Moreover, there clearly is a causal link between the fraud committed on the Court and the posttrial settlement offer. But for the misconduct of McWade and Sims, respondent would not have made the offer or adjusted administratively the accounts of Kersting project petitioners whose cases were closed. There is thus a causal link between the fraud committed on the Court and respondent's decision to make the posttrial settlement offer.

The sanction fashioned by the Court of Appeals provides both an appropriate remedy for the violation of Kesting project petitioners' rights and a deterrent to further misconduct by Government attorneys. To give full effect to that deterrent in the context of respondent's overreaching in trying to take advantage of the initial failure of this Court to provide an appropriate remedy, the Dixon V sanction should be applied to give the same relief to all Kersting project petitioners whose cases were part of the Kersting project test case proceedings who

settled their cases, for whatever reasons at any time during the test case proceedings, without an individualized inquiry in each such case into petitioner's actual knowledge and motivations.  As the Court of Appeals said:

> Here, it plainly would be unjust to remand for a new, third trial.  The IRS had an opportunity to present its case fairly and properly.  Instead its lawyers intentionally defrauded the Tax Court.  The Tax Court had two opportunities to equitably resolve this situation and failed.  Enormous amounts of time and judicial resources have been wasted.  * * * The taxpayers should not be forced to endure another trial and the IRS should be sanctioned for this extreme misconduct.  [Dixon V at 1047.]

In matters involving questions of practice and procedure for which there is no applicable rule, Rule 1(b)[42] permits the Judge of this Court before whom the matter is pending to prescribe an appropriate procedure.  See Ash v. Commissioner, 96 T.C. 459, 469-470 (1991).  Under appropriate circumstances, we may impose sanctions that are designed to mitigate the effects of a party's misconduct.  See Rules 104(c), 123; Betz v. Commissioner, 90 T.C. 816, 823-824 (1988) (as a sanction for the Commissioner's failure to timely file an answer, the Court deemed established that the Commissioner erred in determining that additional interest was due under section 6621(c)); Vermouth v. Commissioner, 88 T.C. 1488, 1499 (1987) (Commissioner not permitted to introduce evidence of fraud because of failure to timely file an answer);

---

[42]Rule 1 was amended effective Sept. 20, 2005.  The identical provision was in Rule 1(a) before the amendment.

Straight v. Commissioner, T.C. Memo. 1997-569 (although the
taxpayer was not prejudiced in presenting the merits of his case
by the misconduct of the Commissioner's revenue agent, the Court
imposed a monetary sanction on the Commissioner in favor of the
taxpayer).

Extending to all Kersting project petitioners who were part
of the Kersting project test case procedure the benefit of the
Thompson settlement without the need for further trial or
evidentiary hearing is the sanction that the Court of Appeals
deemed appropriate and necessary to restore the confidence of
future litigants who may become involved in test case
proceedings.  The legitimacy of the test case procedure itself is
at stake, and the need to protect the integrity of the judicial
process justifies the imposition of sanctions against respondent
by vacating the stipulated decisions in all cases that were part
of the Kersting tax shelter project after the test case procedure
was employed.

B.   Lewis v. Commissioner Reconsidered and Superseded

Reconsideration under Rule 161 is intended to correct
substantial errors of fact or law and allow the introduction of
newly discovered evidence that the moving party could not have
introduced, by the exercise of due diligence, in the prior
proceeding.  Estate of Quick v. Commissioner, 110 T.C. 440, 441
(1998).  This Court has discretion whether to grant a motion for
reconsideration and will not do so unless the moving party shows

unusual circumstances or substantial error.  <u>Zapara v.
Commissioner</u>, 126 T.C. 215, 218-219 (2006); <u>Estate of Quick v.
Commissioner</u>, <u>supra</u> at 441.  "Reconsideration is not the
appropriate forum for rehashing previously rejected legal
arguments or tendering new legal theories to reach the end result
desired by the moving party."  <u>Estate of Quick v. Commissioner</u>,
<u>supra</u> at 441-442.

In opposing petitioners' motions to vacate the decisions in
these cases, respondent relies heavily on the reasoning of our
previously filed Memorandum Opinion, <u>Lewis v. Commissioner</u>, T.C.
Memo. 2005-205, denying the Lewises leave to file motions to
vacate the decisions in their cases.

In <u>Lewis v. Commissioner</u>, <u>supra</u>, we stated that the
directive of the Court of Appeals that terms equivalent to those
of the Thompson settlement be extended to "appellants and all
other taxpayers properly before this Court" by its terms excludes
those who knowingly settled their cases after the predicate facts
of the fraud on the Court had been disclosed.  In <u>Lewis</u> we
commented that the Court of Appeals would have explicitly said so
if it had intended to extend the Thompson settlement to closed
cases.  In Dixon VI, we accepted and adopted the stipulation of
the parties that the phrase "before the Court" includes all open
cases.  Upon reconsideration, we believe that omission by the
Court of Appeals of any reference to closed cases merely reflects
that the Court of Appeals technically had jurisdiction only over

test and nontest cases in which appeals had been filed and that in the ordinary course of proceedings it was only other nontest cases in which stipulated decisions had not yet been entered that would be bound by the final outcome of the test cases. Because the cases in which stipulated decisions had been filed were closed, they would not be before the Court of Appeals in any sense until the Tax Court acted upon any motions for leave that later might be filed.

In Lewis (citing Abatti v. Commissioner, 859 F.2d at 117), we held that the Lewises were not entitled to the benefits of the Thompson settlement because they did not appeal their cases. In Abatti the Court of Appeals held that taxpayers in a tax shelter group who had signed piggyback agreements and failed to appeal adverse decisions in the test cases were not entitled to the relief gained by other piggybackers who did appeal the adverse decisions. The Court of Appeals observed that "There is 'no general equitable doctrine * * * which countenances an exception to the finality of a party's failure to appeal merely because his rights are "closely interwoven" with those of another party.'" Id. at 120 (quoting Federated Dept. Stores, Inc. v. Moitie, 452 U.S. 394, 400 (1981)).

In Abatti, the Court of Appeals specifically held that the situation in that case was not "sufficiently analogous to 'fraud on the court' to warrant an exception to the rule that the Tax Court lacks jurisdiction to vacate a final decision." Id. at

119.  In the cases at hand, the Court of Appeals has held that there was fraud on the Tax Court in the Kersting test case proceedings.  Abatti is therefore not on point.

In Lewis, we analyzed the Lewises' settlement under general principles of contract law.  We held that the Lewises were bound by their settlement and precluded from claiming fraud because, when they accepted the posttrial settlement offer, they and their counsel, Jones and O'Donnell, had actual or constructive knowledge (1) of the predicate facts of the misconduct of respondent's attorneys, including the terms of the Thompson settlement, and (2) that the test cases were being appealed, inter alia, on the ground that respondent's misconduct had created a fraud on the Court.

In Lewis, we failed to consider that this Court knew that there had been secret settlements in the Cravens and Thompson cases when it vacated the decisions that had been entered in those cases in accordance with Dixon II and yet failed to recognize that a sanctionable fraud had been committed on the Court.  The full extent of McWade's and Sims's misconduct was not known until the hearing on remand pursuant to DuFresne.  The DuFresne panel knew the overall terms of the secret Thompson settlement.  Yet that same panel, in Adair v. Commissioner, 26 F.3d 129 (9th Cir. 1994), held that the decision entered in the Thompson cases had become final, which would not have been so had the panel recognized that the misconduct might have been a fraud

on the court.  If knowledge of the existence and terms of the secret Thompson settlement did not alert this Court or the DuFresne panel that the misconduct was a fraud on the Court, we cannot now say that the same knowledge of petitioners and their counsel now bars this Court from imposing sanctions on respondent for the fraud committed on the Court in the cases at hand.

Moreover, our holding in Lewis in effect required the Lewises to show prejudice and allowed respondent to dispute the effectiveness of the fraud after the fact.  On reflection and reconsideration, we now hold that our holding in Lewis is contrary to the holding in Dixon V that the taxpayers who were part of the test case proceedings need not show prejudice to justify relief and that respondent, the perpetrator of the fraud, should not be allowed to dispute the effectiveness of the fraud after the fact.  Dixon V at 1043, 1046.

In Lewis we incorrectly focused on the legal consequences of the Lewises' acceptance of respondent's posttrial settlement offer and applied general principles of contract law.  The proper focus is on whether respondent could through the posttrial disclosure and settlement offer purge from these cases the fraud committed on the Court and whether those actions otherwise rectified the harm caused by the fraud on the Court, eliminating the need for the Court to apply the sanction mandated by the Court of Appeals in cases in which stipulated decisions were entered.

In <u>Lewis</u>, we failed to consider fully the implications of the holding of the Court of Appeals that McWade's and Sims's misconduct violated the rights of all Kersting project petitioners who were bound by the outcome of the Tax Court proceeding and the need to remedy those violations. Respondent's lowball nuisance value reinstated project settlement offer was an attempt to control the fallout or damage to respondent and did not rectify the violation of the rights of the Kersting project petitioners who were bound by the results of the test cases.

Upon reconsideration, we believe that we misapplied the law of the case as it was expounded and applied by the Court of Appeals in Dixon V, leading us to the wrong result.

C. <u>Subsequent Voluntary Disclosure of the Fraud on the Court Does Not Purge the Fraud</u>

Although respondent reported the secret settlements to the Court and counsel for the remaining test case petitioners promptly after discovering McWade's and Sims's misconduct, those disclosures did not purge any of the Kersting project cases of the fraud committed on the Court. Once a fraud is committed, subsequent voluntary disclosure of the fraud does not purge the fraud. <u>Badaracco v. Commissioner</u>, 464 U.S. 386, 394 (1984). A taxpayer who files a fraudulent return, regardless of the taxpayer's subsequent voluntary disclosure, remains subject to criminal prosecution and the civil fraud penalty. <u>Id.</u> The fraud is committed and the offense completed when the original

fraudulent return is prepared and filed. Id. Where a taxpayer files a false or fraudulent return but later files a nonfraudulent amended return, section 6501(c)(1) applies and a tax may be assessed "at any time", regardless of whether more than 3 years have expired since the filing of the amended return. Id. (citing United States v. Habig, 390 U.S. 222 (1968), and Plunkett v. Commissioner, 465 F.2d 299, 302-303 (7th Cir. 1972), affg. T.C. Memo. 1970-274); see also George M. Still, Inc. v. Commissioner, 19 T.C. 1072, 1077 (1953), affd. 218 F.2d 639 (2d Cir. 1955).

In the Kersting test case proceedings, the fraud on the Court committed by respondent's attorneys was completed once the test cases were tried. Respondent's subsequent disclosures to the Court and test case counsel of McWade's and Sims's misconduct did not purge the fraud on the Court in any of the test cases, including the Thompson and Cravens cases, or any of the nontest cases bound by the test cases. Regardless of respondent's disclosures to the Court, all Kersting project cases that were bound by the test cases during the test case proceedings remain cases of fraud on the Court, and respondent remains subject to sanction for that fraud in every case.

Although respondent could not purge the fraud on the Court once it was committed, we will consider whether respondent's posttrial actions mitigated the harm done by the fraud in deciding whether the sanction mandated by the Court of Appeals in

Dixon V should be applied in the cases of Kersting project petitioners who accepted respondent's posttrial settlement offer.

We begin by evaluating respondent's posttrial obligations to the Court and to Kersting project test case and nontest case petitioners. Because the fraud McWade and Sims committed on the Court undermined future litigants' confidence in the test case procedure, we hope that our clarification of respondent's obligations to the Court and to taxpayers who are bound by test case proceedings will help restore public confidence in the test case procedure.

D.  Respondent's Posttrial Settlement Offer Did Not Satisfy Respondent's Obligations to the Nontest Case Petitioners

The Kersting project nontest case petitioners were bound by the results of unspecified test cases. Many, if not most, Kersting project petitioners signed their piggyback agreements before the test cases were selected. As a practical matter, because piggyback agreements did not identify the test cases, Kersting project nontest case petitioners would not know the identity of the test case petitioners until informed by respondent.[43] After the Court filed its Dixon II opinion

---

[43]In this opinion we identify respondent's obligations for purposes of determining whether respondent's actions mitigated the harm caused by the fraud on the Court in the nontest cases for purposes of fashioning an appropriate sanction. Kersting project nontest case taxpayers who received and read Kersting's "Dear Friend" letters learned the identity of the test case petitioners. Respondent is not entitled to rely on Kersting to

(continued...)

respondent was obligated first to notify all Kersting project nontest case petitioners of the terms of the Court's disposition of all the test cases in Dixon II in order to prepare decision documents to be entered in the nontest cases.  Cf. Socony Mobil Oil Co. v. United States, 153 Ct. Cl. 638, 649, 287 F.2d 910, 915 (1961); Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434.  Once the results of the test cases and the Dixon II opinion were questioned because of the misconduct of respondent's attorneys, respondent had the additional obligation to inform the Kersting project petitioners of those facts.  Cf. Socony Mobil Oil Co. v. United States, supra; Estate of Satin v. Commissioner, supra; Fisher v. Commissioner, supra.

In Socony Mobil Oil Co. v. United States, supra, the Commissioner and the taxpayer had agreed to the suspension of the period of limitations for filing a refund claim until the final decision in a test case.  Thereafter the Commissioner settled the test case, preventing it from being decided on the merits and frustrating the purpose of the agreement.  The Court of Claims

---

[43](...continued)
fulfil respondent's disclosure obligations to the nontest case petitioners.  Moreover, reliance on the Kersting letters to satisfy respondent's obligation would present factual issues requiring a trial.  "Enormous amounts of time and judicial resources have been wasted."  Dixon V at 1047.  We will not require another trial in each previously settled case to determine whether sanctions should be imposed for the fraud on the Court.

observed that, unless the Government informed the taxpayer of the settlement, the taxpayer would have had to be most diligent in watching the District Court's judgment docket in order to file its suit in time after the "final decision" of the test case. Id. at 649, 287 F.2d at 915.  The Court of Claims held open the period of limitations and held that the taxpayer was entitled to recover on its refund claim.

In Estate of Satin v. Commissioner, supra, and Fisher v. Commissioner, supra, the taxpayers agreed to be bound by the resolution of tax shelter adjustments, whether by litigation or settlement, in test cases specifically identified in the agreements by name and docket number, Provizer v. Commissioner, docket No. 27141-86, and Miller v. Commissioner, docket Nos. 10382-86 and 10383-86.  The Miller cases settled before trial with the taxpayers conceding the deficiencies and the Commissioner conceding the additions to tax.  The Commissioner did not notify any of the taxpayers who had agreed to be bound by the Provizer and Miller cases that the Miller cases had been settled.  The Provizer case subsequently was tried on the merits, resulting in Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993), sustaining both the Commissioner's deficiency and additions to tax determinations.  The Commissioner assessed taxes, additions to tax, and interest in accordance with Provizer against the taxpayers in the Estate of Satin and Fisher cases.

On receiving the assessments, the taxpayers asked about the Miller cases. Learning for the first time that the Miller cases had settled, the taxpayers filed motions for entry of decision consistent with the terms of the Miller settlements, which the Court granted. In granting the motions, the Court held that the taxpayers should have been given the opportunity to agree to the terms offered in the Miller cases. Because the Commissioner failed to notify the taxpayers of the Miller settlements before the Provizer case was resolved, the Court held that the taxpayers were entitled to entry of decision in their cases in accordance with the more favorable terms of the Miller settlements.

Respondent asserts that Estate of Satin and Fisher do not apply, under our holding in Gridley v. Commissioner, T.C. Memo. 1997-210. In Gridley, we denied the motions for summary judgment of the Fleer and Gridley Kersting project petitioners and distinguished Estate of Satin and Fisher because the agreements in those cases bound the taxpayers to the resolution of the test cases "whether by litigation or settlement", whereas the Fleers' and the Gridleys' Kersting project piggyback agreements did not mention settlement of the test cases. Respondent asserts that Estate of Satin and Fisher do not apply in the cases at hand because petitioners, like the Fleers and the Gridleys, were bound by their piggyback agreements to the Court's determination in "an unspecified 'TRIED CASE' group of cases". We agree that petitioners' piggyback agreements do not mention settlement of

the test cases.  The Court of Appeals for the Ninth Circuit, however, remanded Gridley for further proceedings consistent with Dixon V.

In so doing, the Court of Appeals in Dixon V established entitlement to the Thompson settlement as the "law of the case" for the Kersting project.  In all cases without piggyback agreements that were governed by the order to show cause procedure, Dixon V superseded Dixon II, entitling Kersting project petitioners in such cases to the benefit of the Thompson settlement.  In effect Dixon V also superseded or amended the piggyback agreements to incorporate entitlement to the Thompson settlement just as if the Kersting piggyback agreements had incorporated the "or settlement" language of the Satin/Fisher piggyback agreements.

Moreover, implicit in an agreement binding a private party to the results of one or more test cases in a test case proceeding is the requirement that the Government notify the other party to the agreement about the results of a test case or cases controlling the agreement, regardless of whether the private party is bound by the settlement or litigation of the test cases, as in Estate of Satin and Fisher, or by the litigation of the test cases, as in Socony Mobil Oil Co. v. United States, supra at 649, 287 F.2d at 915-916.  We believe the rationale of Socony Mobil Oil, Estate of Satin, and Fisher that requires the Government to notify the other party bound by the

results, through settlement or litigation, of a test case is just as compelling when the other party is bound by the outcome of a trial of an undifferentiated group of test cases. The Commissioner knows the names and docket numbers of the test cases and participates in the trial of those test cases. Most importantly, when the Court files its opinion deciding the issues tried in the test cases, the Commissioner is served a copy of the opinion. By contrast, the Court does not serve a copy of its test case opinion on nontest case taxpayers who are bound by the opinion, and those taxpayers must await notification by the Commissioner.

Every contract imposes upon the parties thereto an implied duty of good faith and fair dealing. San Jose Prod. Credit Association v. Old Republic Life Ins. Co., 723 F.2d 700, 703 (9th Cir. 1984); Smith v. Empire Sanitary Dist., 273 P.2d 37, 43 (Cal. Ct. App. 1954); 3A Corbin on Contracts, sec. 654A, at 86 (1998 Supp.). Since respondent was obliged to inform Kersting project nontest case petitioners of the results of the test cases, respondent's implied duty of good faith and fair dealing imposed an obligation on respondent to inform nontest case petitioners that the results of the test cases were being called into question and to disclose all material facts concerning the misconduct known to respondent. The nontest case petitioners could not have anticipated that motions to vacate the decisions would be filed in the test cases. Unless respondent informed

them of the motions, they would have had to be most diligent in checking each of the test case dockets in order to discover whether decisions entered in any of the test cases were being vacated or appealed. See <u>Socony Mobil Oil Co. v. United States</u>, <u>supra</u>. Moreover, respondent had the same disclosure obligations with respect to all nontest case petitioners who did not sign piggyback agreement; those Kersting project petitioners were bound by the results in the test case by reason of the Court's order to show cause procedure.[44]

Respondent recognized respondent's obligation to inform the Court and the other test case petitioners about the secret settlements.[45] Respondent contends that respondent had no

---

[44]See <u>supra</u> note 6.

[45]Respondent avers:

Even before the investigation uncovered all the underlying facts, respondent quickly brought the fact of the improper settlement to the attention of the court and opposing counsel. On June 9, 1992, respondent filed motions to vacate decisions in the cases of the test case petitioners who were still under the Tax Court's jurisdiction (Thompson, Cravens and Ralph Rina (Rina)). The motions requested an evidentiary hearing into the entire matter, stating that the "existence of the understanding and the failure to divulge same to the Court and the other Test Case petitioners prior to the trial raise questions which should be addressed by the Court and the parties * * *.

By filing the motion to vacate in the <u>Rina</u> case, respondent notified Izen, counsel for other test case petitioners whose cases were already on appeal, of the predicate facts of the misconduct of respondent's attorneys.

obligation to inform Kersting project nontest case petitioners of the terms or existence of the Thompson settlement. We disagree.

In respondent's motion for entry of decision in the Thompson cases, respondent acknowledged that McWade, Sims, and DeCastro "owed a special duty to disclose" the Thompson settlement agreement to the Court. Quoting Reager v. Anderson, 371 S.E.2d 619, 630 (W. Va. 1988), respondent further acknowledged that

> "It is critical to the fair conduct of the trial to disclose promptly the settlement terms to the court and to opposing counsel so that the court can decide whether the agreement is valid, and if so, what measures should be taken to ensure that the nonsettling party(ies) will not be prejudiced." * * * [Emphasis supplied by respondent.]

Respondent noted that "this is particularly important where the settling party remains in the litigation, testifies with respect to the issues, and his attorney appears to be an advocate adverse to the party paying the fees."

Respondent asserts that respondent fulfilled respondent's obligation to disclose the secret Thompson and Cravens settlements when respondent disclosed the terms of the agreements to the Court and counsel for the remaining test case petitioners. To the contrary, that disclosure only satisfied part of respondent's obligation. Reager v. Anderson, supra, concerned the plaintiff's "Mary Carter" contingent settlement with one of the defendant tortfeasors. The excerpt from Reager v. Anderson, supra at 630, makes clear that not only the existence of the settlement agreement with one defendant but also the terms of the

agreement must be disclosed to opposing counsel for other defendants to protect the rights of the nonsettling parties. In a test case proceeding, the nonsettling parties include all taxpayers who are bound by the test case and who may be prejudiced by the settlement. Thus, under the reasoning of Reager v. Anderson, supra, respondent had a further obligation to disclose the terms of the secret Thompson settlement not only to the remaining test case petitioners but to all Kersting project nontest case petitioners who were bound by the outcome of the test cases. In cases where the nontest case petitioner was represented by counsel, respondent was obligated to inform that counsel of the existence and the terms of the previously undisclosed Thompson and Cravens settlements. Where the nontest case petitioner was proceeding pro se, respondent was obligated to inform the petitioner of the existence and terms of the agreements.

Respondent did not satisfy those obligations. Although respondent's posttrial settlement offer informed the Kersting project nontest case petitioners that there had been secret settlements with some test case petitioners, the offer did not disclose the names of the test case petitioners who had settled their cases, nor did it disclose the terms of the settlements.

Finally, when respondent disclosed the secret settlements to the Court, respondent admitted that McWade and Sims had authority to enter into the original 18.8-percent Thompson settlement but

argued that they did not have authority to enter into the final Thompson settlement. Respondent's position in the motions to vacate the decisions in the Thompson, Cravens, and Rina cases was that the Court needed to decide whether the secret settlements and the testimony of Cravens and Thompson affected the outcome of the test cases. Respondent did not disclose to the Court that McWade's and Sims's entering into a secret settlement giving the Thompsons preferential treatment violated Department of the Treasury Minimum Standards of Conduct and thus did not alert the Court that it might be unfair to enter decisions in accordance with Dixon II in the cases of other Kersting project petitioners. After the Court denied the motion to vacate the Rina decision, respondent did not inform the Court when respondent's National Office decided "in fairness" to reinstate the lowball nuisance value project settlement offer, that stipulated decisions were being entered in Kersting project cases in accordance with that offer, or that respondent was administratively adjusting Kersting project petitioners' tax liabilities that had been assessed in accordance with Dixon II. We now agree with the Court of Appeals for the Ninth Circuit that respondent's disclosure to the Court "was anything but complete". Dixon V at 1045 n.8.

### E. Respondent's Posttrial Settlement Offer Did Not Rectify the Harm and Does Not Preclude Additional Sanctions

We next consider whether respondent's posttrial actions rectified or otherwise mitigated the harm done by the fraud in

deciding whether the sanction mandated by the Court of Appeals in Dixon V should be applied in the cases of Kersting project petitioners who accepted respondent's posttrial settlement offer. In so doing, we recognize that the Court of Appeals was aware when it fashioned the sanction it deemed appropriate that respondent had promptly disclosed the overall misconduct to this Court after discovering the secret agreements.

A party cannot avoid sanctions for committing a fraud on the court by settlement or withdrawal from the case. See, e.g., Bader v. Itel Corp. (In re Itel Secs. Litig.), 791 F.2d 672 (9th Cir. 1986). It is well settled that an agreement between private parties cannot deprive the Court of its power to investigate, to render rulings, or to impose sanctions for an alleged fraud upon the court. Chambers v. NASCO, Inc., 501 at 44 (citing Universal Oil Prods. Co. v. Root Ref. Co., 328 U.S. 575, 580 (1946)); see also Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944); Bush Ranch, Inc. v. E.I. du Pont de Nemours & Co., 918 F. Supp. 1524 (M.D. Ga. 1995), revd. and remanded on other grounds 99 F.3d 363 (11th Cir. 1996). "Of particular relevance here, the inherent power also allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court." Chambers v. NASCO, Inc., supra at 44 (citing Hazel-Atlas Glass Co. v. Hartford-Empire Co., supra, and Universal Oil Prods. Co. v. Root Ref. Co., supra at 580); see also Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 396 (1990) ("A court may make an

adjudication of contempt and impose a contempt sanction even after the action in which the contempt arose has been terminated."); Bush Ranch, Inc. v. E.I. DuPont De Nemours & Co., 99 F.3d at 367-368 (District Court had power to investigate an alleged fraud upon the court and impose civil sanctions for the fraud in a case where the plaintiffs had voluntarily moved for dismissal of their claims with prejudice 2 years earlier).

Further, we agree with petitioners that their acceptance of the posttrial settlement offer did not release respondent from the consequences of the fraud on the Court. In Lewis v. Commissioner, T.C. Memo. 2005-205, we stated that the Lewises settled their cases with the understanding, set forth explicitly in respondent's posttrial settlement offer, that accepting the offer would "'preclude any further challenge or appeal with respect to the Kersting programs or the merits of the Dixon opinion'." On reconsideration, we now conclude that petitioners' requests that sanctions be imposed on respondent for the fraud committed in their cases is not a challenge to the Kersting programs or to the merits of the Dixon II opinion within the meaning of respondent's posttrial settlement offer.

A settlement "is a contract and thus is a proper subject of judicial interpretation as to its meaning, in light of the language used and the circumstances surrounding its execution." Robbins Tire & Rubber Co. v. Commissioner, 52 T.C. 420, 435-436 (1969); see also Brink v. Commissioner, 39 T.C. 602, 606 (1962),

affd. 328 F.2d 622 (6th Cir. 1964); Saigh v. Commissioner, 26

T.C. at 177; Davis v. Commissioner, 46 B.T.A. 663, 671 (1942);

Himmelwright v. Commissioner, T.C. Memo. 1988-114.  The

circumstances in the Kersting test case proceedings and the terms

of the posttrial settlement offer show that petitioners did not

release respondent from claims arising from or related to

McWade's and Sims's misconduct during the Kersting test case

proceedings.

First, respondent's lowball posttrial settlement offer

omitted material facts that might have affected some petitioner's

decisions to settle their cases, and those omissions were

deliberate.  Respondent asserts that the highest levels of

respondent's management reviewed the posttrial settlement offer

and provided input into the final product and that there was no

effort to mislead or conceal facts.  Although respondent's

highest management did participate in the process, we disagree

that there was no effort to mislead or conceal facts.

The Dombrowski draft, which was the earliest and most

forthcoming of the drafts, did not reveal the terms of the secret

settlements, and the later drafts, culminating in the posttrial

settlement offer, progressively revealed fewer and fewer material

facts.  The Dombrowski draft revealed that before the trial

settlement agreements had been reached with two of the test case

petitioners and identified the Cravenses and the Thompsons as

those petitioners.  It gave a full citation for Dixon II,

explained the holding of the case, and informed the reader that five of the test case petitioners (Dixon, DuFresne, Hongsermeier, Owens, and Young) had appealed their cases to the Court of Appeals for the Ninth Circuit, but that the appeals had not yet been resolved.

Each subsequent draft included less and less information. Respondent's final posttrial settlement offer informed the offerees of the Court's holding and gave a citation to Dixon II. It informed the reader that two test case petitioners had entered into settlement agreements before the trial, and that these agreements had not been disclosed to the Tax Court or the other test case petitioners.

Respondent's posttrial settlement offer constituted less than full disclosure and was misleading in a number of respects. It did not identify the test case petitioners who had settled their cases, did not identify the other test case petitioners, and did not describe the terms of the settlements. It did not even indicate that the two couples who had settled their test cases had received very different settlements and that one couple had received a settlement that was much more favorable to them than all but one other settlement (the Alexander settlement) with Kersting project petitioners. It did not disclose the amounts or percentages of the reductions of the deficiencies in the Cravens and Thompson settlements and the disparity between them. It did not disclose that the Thompson settlement was not only initially

more favorable to the Thompsons than the project settlement offer (and that there had been other settlements more advantageous to Kersting project petitioners than the project settlement offer), but that the more favorable Thompson settlement was finally substantially sweetened to create a fund to pay the fees of DeCastro, Thompson's counsel. The offer's purported reinstatement of the project settlement offer did not refer to the burnout that McWade had incorporated in the project settlement offer and in the settlements of a majority of the cases that had been settled before the termination of respondent's original project settlement offer. Most of these facts had been disclosed to the Tax Court in summer 1992 in respondent's papers opposing Thompson's counsel's motion to enter decision on the terms of the Thompson settlement, but they were not disclosed by respondent to the offerees.

The offer's statement that "The Tax Court's opinion as it pertains to other Kersting cases remains unchanged" was misleading, because it conveyed the impression that Dixon II and the Court's rulings were the last word on the subject. It failed to disclose that the other test cases were on appeal and that appellants were asserting fraud on the court as a ground for vacating the decisions in the other test cases.

The failure of the offer to disclose and identify the test case petitioners who had received a very different settlement, giving them much more favorable treatment, and that giving

preferential treatment violated IRS policy and the Department of the Treasury Minimum Standards of Conduct renders disingenuous the statement in the posttrial settlement offer "we have concluded that in fairness all petitioners be afforded an opportunity to settle their cases".

The lack of fairness of the 7-percent offer is further evidenced by the disciplinary action respondent brought against McWade and Sims solely on the basis of the Thompson settlement and not the secret Cravens settlement, which approximated the 7-percent project settlement offer.  The notices of proposed disciplinary action sent to McWade and Sims on July 29, 1993, asserted, inter alia, that they had (1) failed to avoid any action which might result in or create the appearance of giving preferential treatment to any person; (2) failed to avoid any action that might adversely affect the confidence of the public in the integrity of the Government; and (3) intentionally made false or misleading verbal or written statements in matters of official interest.  The notices listed the following reasons for the proposed disciplinary actions:  (1) Negotiating an unauthorized settlement agreement with the Thompsons; (2) basing the Thompson settlement on unaudited and insufficiently documented losses from an unrelated shelter; (3) allowing the Thompsons a settlement that provided them more favorable treatment than other taxpayers; (4) compensating the Thompsons for their attorney's fees; and (5) not informing the Tax Court of

the Thompson settlement arrangements. The notices make no mention of the Cravens settlement even though that settlement also had not been disclosed to the Court. The notices clearly focus on the favorable treatment and benefits given to the Thompsons.

Under normal circumstances, the Commissioner is not required to offer the same settlement terms to taxpayers whose cases are part of a test case proceeding. See Estate of Campion v. Commissioner, 110 T.C. 165, 170 (1998), affd. without published opinion sub nom. Tucek v. Commissioner, 198 F.3d 259 (10th Cir. 1999), affd. without published opinion sub nom. Drake Oil Tech. Partners v. Commissioner, 211 F.3d 1277 (10th Cir. 2000). However, under the circumstances in the Kersting test case proceedings and consistent with the Department of the Treasury Minimum Standards of Conduct, we believe "in fairness" that respondent should have offered to provide other Kersting taxpayers the same favorable treatment given to the Thompsons, as the Court of Appeals finally concluded in Dixon V.

In Estate of Campion, the taxpayers had settled all issues related to their participation in certain tax shelters, and final decisions had been entered in their cases. The underlying tax shelters were the subject of test case litigation in Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994); Acierno v. Commissioner, T.C. Memo. 1997-441, affd. without published

opinion 185 F.3d 861 (3d Cir. 1999); Karlsson v. Commissioner, T.C. Memo. 1997-432; and Vanderschraaf v. Commissioner, T.C. Memo. 1997-306, affd. without published opinion 211 F.3d 1276 (9th Cir. 2000), affd. without published opinion sub nom. Estate of Lawrenz v. Commissioner, 238 F.3d 429 (9th Cir. 2000). Beginning in 1986, the Commissioner made a series of settlement offers to the tax shelter investors. As time went by and the test cases approached trial, the Commissioner's settlement position generally became more favorable to the Commissioner and less favorable to the investor-taxpayers. Each of the various settlement offers incorporated a time deadline beyond which the settlement would no longer be available.

The Estate of Campion taxpayers did not choose to settle their cases. Rather, they waited until after the issuance in 1992 of the opinion in the test cases in Krause v. Commissioner, supra. The settlements the Estate of Campion taxpayers then agreed to were consistent with the decisions in Krause and the related cases. The Estate of Campion taxpayers thereafter sought orders from the Court vacating their agreed decisions and requiring the Commissioner to give them new settlements incorporating the more favorable settlement terms that had been available to taxpayers in earlier years. In so doing, the Estate of Campion taxpayers alleged, inter alia, that there had been a fraud on the Court in the settlement of their cases.

In Estate of Campion, we held that the Commissioner had not
committed fraud on the Court and denied the taxpayers leave to
file motions to vacate final decisions.  In deciding that the
Commissioner had not committed fraud on the Court, we noted that
the taxpayers' former and/or then-present counsel, who
represented many taxpayers who were involved in the tax shelters,
had been aware of all settlement positions that had been made
available by the Commissioner.  We emphasized that all investors
in the tax shelters were treated consistently by the Commissioner
and were given the same opportunity to settle their tax disputes
on the same terms and with the same time deadlines, and that each
different settlement position of the Commissioner had been
adequately communicated to all investors in the tax shelters and
had been based on the "hazards of litigation" as perceived by the
Commissioner at each relevant point in time.  The taxpayers
thereby failed to establish any "scheme of secrecy" to hide the
availability of the Commissioner's various settlement positions,
which had been made available over the years to all taxpayers who
had invested in the tax shelters.

None of the exculpating factors considered by the Court in
Estate of Campion are present in the cases at hand.  The record
is replete with aggravating factors to the contrary.  Respondent
did not treat all Kersting project petitioners consistently;
respondent did not give all Kersting project petitioners the same

opportunity to settle their tax disputes on the same terms and with the same time deadlines. Only the initial 7-percent project settlement offer and the modified 7-percent settlement offer with the burnout had been adequately communicated to all Kersting project petitioners. The 20-percent settlements negotiated by DeCastro and by Chicoine and Hallett for some of their clients and the various Thompson settlements were not communicated to other Kersting project petitioners. Only the 20-percent settlements had been based on the "hazards of litigation". The final Thompson settlement was not communicated to any other Kersting project petitioners and was not based on the hazards of litigation, and most importantly, there was a "scheme of secrecy" to hide the Thompson settlement that constituted the fraud on the Court.

Respondent acknowledged that McWade and Sims had authority to negotiate the 20-percent settlements and that the Thompsons were entitled to have decisions entered in accordance with their initial settlement agreement. Once McWade and Sims began to accept 20-percent settlements on the basis of hazards of litigation, they should have communicated a 20-percent offer to all Kersting project petitioners so as not to favor those petitioners represented by DeCastro and Chicoine and Hallett over others, especially those who were unrepresented by counsel. Their failure to do so undermined the confidence of the Court and

the public in the fairness of the test case procedure.  The

factors we considered in Estate of Campion lead us to conclude

that, once respondent discovered McWade's and Sims's misconduct

and decided that "in fairness" the other Kersting project

petitioners ought to have the opportunity to settle on more

favorable terms than provided by Dixon II, in fairness respondent

should have made the 20-percent initial Thompson settlement

available to the other Kersting project petitioners.  Such an

offer would have been consistent with respondent's position in

respondent's motions for entry of decision in the Thompson cases

that the 20-percent settlements were valid, but that the final

Thompson agreement was invalid because respondent's provision for

payment of DeCastro's fees was illegal.[46]

Respondent's management owed every petitioner whose case was

bound by the Kersting project test case proceedings a duty of good

faith and fair dealing.  "Chief Counsel attorneys are expected to

adhere to the highest standards of conduct, not simply conform to

---

[46]During the Dixon V remand proceeding, respondent also
contended that the final Thompson settlement represented a
20-percent reduction in Kersting deficiencies, plus legal fees
incurred in trying the test cases.  In Dixon VI, we rejected
respondent's argument that Kersting project petitioners were not
entitled to recover legal fees after Dixon II because the fees
had been paid by Kersting and therefore petitioners were entitled
only to the 20-percent reduction in liabilities.  We instead gave
effect to the Thompson settlement in accordance with its express
terms, as a more than 60-percent reduction in the Kersting
deficiencies.

minimum professional obligations." CC-2003-008 (appendix B). The "goal as IRS lawyers cannot be to collect the most revenue for the government or win cases at all costs. * * * [The] goal must be to ensure that the tax system is administered fairly and impartially". Williams, Remarks at the Meeting of the New York State Bar Association Tax Section (Jan. 21, 2003) (appendix A). In offering the posttrial settlement, respondent's management fell short of that goal and failed to satisfy the duty of good faith.

We have held that McWade and Sims committed a fraud on the Court in every case that was bound by the Kersting project test cases and that the fraud was not purged by respondent's disclosure to the Court. Additionally, we have found (1) that respondent was obligated to inform Kersting project nontest case petitioners of the existence and terms of the Thompson settlement and that Dixon II was being appealed and (2) that respondent intentionally omitted those material facts in the posttrial settlement offer. Willful concealment or omission of material facts or intentional statements of half-truths will support a finding of fraud. United States v. Romano, 736 F.2d 1432, 1439 (11th Cir. 1984), revd. in part on other grounds 755 F.2d 1401 (11th Cir. 1985). Misleading half-truths are distinguishable from nondisclosures and constitute an exception to the general rule of nonliability for nondisclosure or other failure to act. Randi W. v. Muroc Joint Unified Schl. Dist., 929 P.2d 582, 592 (Cal. 1997). Providing "'half of the

truth may obviously amount to a lie, <u>if it is understood to be the whole</u>.'" <u>Id.</u> at 592 (quoting Prosser & Keeton, The Law of Torts, Misrepresentation and Nondisclosure, sec. 106, at 738 (5th ed. 1984)). Respondent, having disclosed some of the facts concerning the irregularities in the test case procedure, was obliged to disclose all facts that would materially qualify the limited facts that were disclosed. See <u>id.</u> at 1082. The Court has held that a settlement stipulation may be set aside for excusable, damaging reliance upon a false or untrue representation of the other party. <u>Saigh v. Commissioner</u>, 26 T.C. at 180; <u>Fisher v. Commissioner</u>, T.C. Memo. 1994-434.

Respondent's limited disclosure and reinstatement of the lowball nuisance value pretrial settlement offer could not "purge" the fraud on the Court that attached to the cases of the Kersting project nontest case petitioners and did not mitigate the harm caused by the misconduct. Respondent's failure to disclose fully all material facts in the posttrial settlement offer and the express language of the posttrial settlement offer show that the acceptance of the posttrial settlement offer did not release respondent from Kersting project petitioners' claims of fraud on the Court or bar them from requesting that the Court impose sanctions for the violation of petitioners' rights. The language in the stipulated decisions and the posttrial settlement agreement does not contain language specifically releasing respondent from

matters arising from the misconduct.  See U.S. Anchor Manufacturing, Inc. v. Rule Indus., Inc., 27 F.3d 521 (11th Cir. 1994); see also U.S. Anchor Manufacturing, Inc. v. Rule Indus., Inc., 7 F.3d 986, 1004 (11th Cir. 1993).

An agreement that settles only specific matters does not necessarily settle other matters related to the settled ones. Manko v. Commissioner, 126 T.C. 195, 204 (2006).  In Manko, the parties agreed to the treatment of the partnership items in the closing agreement.  The preamble to the closing agreement explained that the parties wished to determine with finality the taxpayers' distributive share of income, gains, losses, deductions, and credits with respect to the partnership for the years at issue.  The final paragraph of the closing agreement provided that the agreement did not affect or preclude later adjustments of any item (other than those relating to the partnership) for the years at issue.  The Commissioner sent the taxpayers Income Tax Examination Changes that reflected the Commissioner's computation of their tax liabilities in accordance with the agreed treatment of the partnership items.  The Commissioner then assessed the deficiencies shown in the Income Tax Examination Changes without issuing the taxpayers a notice of deficiency.  The Commissioner never issued the taxpayers a deficiency notice for the years at issue, and the taxpayers never executed a formal waiver of restrictions on assessment.  The Court

held that the closing agreement covered the specific partnership items only and did not absolve the Commissioner from issuing a deficiency notice before assessing the taxpayers' liabilities.

In the cases at hand the posttrial settlement offer stated: "Acceptance of this settlement offer will preclude any further challenge or appeal with respect to the Kersting programs or the merits of the Dixon opinion. Any other issues involved in this case will be resolved separately." We have repeatedly found that the fraud on the Court did not affect the Dixon II opinion as it related to the merits of the case or the validity of the Kersting programs. The harm caused by the fraud on the Court, namely the violations of the rights of the Kersting project petitioners, is unrelated to the Kersting programs or the merits of the Dixon opinion. Whether respondent should be sanctioned for the fraud on the Court as it relates to petitioners' cases is not a "challenge or appeal with respect to the Kersting programs or the merits of the Dixon opinion". Rather, it is a claim for a remedy and a sanction for the violation of petitioners' rights that is another issue involved in the Kersting project cases, the resolution of which respondent's language specifically excluded from the posttrial settlement being offered. The posttrial settlement agreement has no provision "releasing" respondent from claims related to the misconduct of respondent's attorneys during the trial of the test cases.

Although respondent may have intended the phrase "other issues involved in this case will be resolved separately" to refer to non-Kersting issues related to adjustments made in the notices of deficiency issued to Kersting project petitioners, the general contract principle of contra proferentem weighs heavily against respondent. That principle requires that an ambiguous provision in a written document be construed more strongly against the person who selected the language. United States v. Seckinger, 397 U.S. 203, 216 (1970); Moulor v. Am. Life Ins. Co., 111 U.S. 335, 341-342 (1884) (citing Grace v. Am. Cent. Ins. Co., 109, 282 U.S. 278 (1883)); Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 539 (9th Cir. 1990); Rink v. Commissioner, 100 T.C. 319, 328 n.8 (1993), affd. 47 F.3d 168 (6th Cir. 1995).

Moreover, it is the Court that holds the inherent power to impose sanctions against respondent for the fraud committed on it, and the parties cannot by agreement divest the Court of that power. Neither the terms of the settlements nor the stipulated decisions entered in these cases release respondent from any claims by petitioners that the Court should impose sanctions for the fraud committed on the Court in their cases.

After reviewing respondent's posttrial actions and settlement offer in their totality, we conclude that those actions and the posttrial settlement offer did not rectify respondent's violation of the rights of Kersting participant petitioners who were bound

by the results of the test cases; in fairness, all Kersting project petitioners whose cases were bound by the Kersting test case proceedings are entitled to the benefit of the Thompson settlement.

### Conclusion

We hold that neither the posttrial settlement offer nor the stipulated decisions thereby generated bar the Court from considering the fraud on the Court as it affected all cases pending at the time the offer was made or imposing sanctions to remedy the harm caused by the fraud on the Court. We also hold that all Kersting project petitioners whose cases were bound by the results in the Kersting project test cases are entitled to the benefit of the Thompson settlement regardless of when they settled their cases. All taxpayers whose cases are part of a test case procedure should be assured that the test cases will be well and fairly tried, regardless of whether or when they settle their cases. The misconduct that was a fraud on the Court began long before the trial of the test cases that resulted in Dixon II. The Kersting project test case proceedings began June 10, 1985, the first day of the June 1985 session during which the Court agreed with Seery and McWade to use the test case proceeding to resolve all Kersting project cases. We do not think that justice would be served if we were to require another trial in each previously settled case to determine whether sanctions should be imposed for

the fraud committed on the Court during the Kersting test case proceedings. As expressed by the Court of Appeals in Dixon V at 1047:

> Here, it plainly would be unjust to remand for a new, third trial. The IRS had an opportunity to present its case fairly and properly. Instead its lawyers intentionally defrauded the Tax Court. The Tax Court had two opportunities to equitably resolve this situation and failed. Enormous amounts of time and judicial resources have been wasted. * * *

In Hazel-Atlas Glass Co. v. Hartford Empire Co., 322 U.S. 238 (1944), the Supreme Court explained that the inquiry into whether a judgment should be set aside for fraud on the court focuses not so much on whether the alleged fraud prejudiced the opposing party but on whether the alleged fraud harms the integrity of the judicial process. The misconduct of McWade and Sims was a fraud on the Court because it harmed the integrity of the judicial process. The judicial process that was harmed by the misconduct was more than just the trial of the test cases; the judicial process that was implicated is the test case procedure that encompassed the cases of all taxpayers before this Court that were bound by the results in the test cases. The judicial process referred to by the Court of Appeals also encompasses all future cases employing test case procedures. Taxpayers' confidence in future test case proceedings was undermined by the misconduct. Dixon V at 1046-1047. In deciding the proper sanction to impose for the fraud on the Court, we must "carefully balance the policy

favoring adjudication on the merits with * * * the need to maintain institutional integrity and the desirability of deterring future misconduct."  Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989) (finding that the District Court considered the relevant factors and in dismissing the action acted well within its discretion).

Respondent's attorneys committed a fraud on the Tax Court during the Kersting test case proceedings that was a fraud on the Court in every case bound by the results of the test cases. Extending to every petitioner whose case was bound by the results of the Kersting project test cases, by piggyback agreement or the Court's order to show cause procedure, the benefit of the Thompson settlement strikes us as an appropriate accommodation of the competing considerations; it is a sanction for the misconduct that is consistent with Dixon V and is "no more than necessary" to maintain public trust in the judicial process that employs test case procedures.  See, e.g., Gomez v. Vernon, 255 F.3d 1118, 1135 (9th Cir. 2001).  We have considered the relevant factors with the standard set by the Court of Appeals in Dixon V.  We are protective of the integrity of our judicial process and concerned about deterrence.  We are "entitled to send a message, loud and clear."  Aoude v. Mobil Oil Corp., supra at 1122.  We hold that sanctions should be imposed in the cases of all Kersting project petitioners in which stipulated decisions were entered on or after

June 10, 1985, the date the Kersting project test case proceedings began.

Our holding is limited to the unique and narrow circumstances of these cases--where we are imposing sanctions for a fraud committed on the Court in a test case proceeding that bound more than a thousand cases.  Compare Dixon V with <u>Abatti v. Commissioner</u>, 859 F.2d at 117.

Having reconsidered <u>Lewis v. Commissioner</u>, T.C. Memo. 2005-205, and addressed the merits of petitioners' arguments and respondent's objections, we shall grant petitioners' motions to vacate the stipulated decisions entered in the cases at hand and enter new decisions in accordance with Dixon VI and Dixon VIII, giving effect to the opinion of the Court of Appeals for the Ninth Circuit in Dixon V.

<u>Implementation of Sanction</u>

Recognizing that "Enormous amounts of time and judicial resources have been wasted", the Court wishes to relieve other Kersting project nontest case petitioners who had stipulated decisions entered in their cases on or after June 10, 1985, of the burden of filing motions for leave to file motions to vacate decisions.  We believe that the most expeditious and efficient means of implementing the sanction is to allow respondent to adjust administratively the accounts of all Kersting project petitioners, other than Hartman, the Lewises, and the Lius,

without requiring further action from the Kersting project
petitioners.[47]  Administrative adjustments would eliminate the need
for other Kersting project petitioners to file motions for leave
to file motions to vacate the decisions in their cases and the
attorney's fees that otherwise might be incurred and claimed for
the preparation and filing of such motions.

To facilitate the implementation of this sanction, we shall
issue an order (the implementation order) directing respondent to
send a copy of this opinion and the implementation order to all
taxpayers who filed petitions in this Court contesting the
adjustments at issue in Dixon II who had stipulated decisions
entered in their cases (closed cases) on or after June 10, 1985.
That notification action by respondent is to be completed within
60 days after the decisions entered in these cases become final;
i.e., after the Court of Appeals for the Ninth Circuit renders its
decision, if and when the decisions herein should be appealed.
See Bush Ranch, Inc. v. E.I. du Pont de Nemours & Co., 918 F.
Supp. at 1556.

Respondent shall have 9 months after the date the decisions
in these cases becomes final (the implementation period) to adjust

---

[47]It appears to the Court that respondent can make such
administrative adjustments as evidenced by the fact that, after
the decisions in the Kahle cases became final, respondent
administratively partially abated Kahle's agreed deficiency by
giving him the benefit of the 7-percent reduction provided for in
the posttrial settlement offer.

administratively the accounts of all Kersting project petitioners who had stipulated decisions entered in their cases on or after June 10, 1985. The implementation order will require respondent to provide the following additional information to the Kersting project petitioners:

1. The name of IRS contact personnel who can answer any questions Kersting project petitioners may have concerning the adjustments of their accounts;

2. the date the decisions in these cases became final; and

3. the expiration date of the implementation period. The implementation order will require respondent, on or before the expiration of the implementation period, to file a status report with the Court, listing the cases of all Kersting project petitioners to whom respondent sent copies of this opinion and the implementation order and identifying any petitioner whose account has not been adjusted administratively.

During the implementation period, the Court will not grant leave to file motion to vacate decision in any case where motions for leave have been filed. If respondent adjusts administratively the accounts of those Kersting project petitioners who have filed motions for leave and the parties notify the Court of the adjustment, the Court will deny as moot the motions for leave. Additionally, the Court will not accept for filing any motions for leave to file motions to vacate the decisions in the cases of any

other Kersting project petitioner unless and until respondent fails to adjust administratively the account of the Kersting project petitioner before the expiration of the implementation period.  If respondent does not timely adjust administratively the account of any Kersting project petitioner, the Court will accept for filing a motion for leave to file motion to vacate decision, will grant leave to file such a motion, and will order respondent to show cause why the Court should not grant the motion to vacate decision and enter a new decision in accordance with this opinion.

To reflect the foregoing,

<u>Appropriate orders will be issued, and decisions will be entered under Rule 155</u>.

APPENDIX A

B. John Williams, Jr., Chief Counsel, Internal Revenue Service
Remarks at the Meeting of the New York State Bar Association
Tax Section (Jan. 21, 2003), in 2003 TNT 15-20


The public's confidence in our tax system rests, in significant part, on their perception of fairness in the administration of the tax laws. This begins with government first. We need to be open with the public on our positions, principled in our application of the laws, and even-handed in our enforcement efforts. In this connection, I would like to comment on a case that you may have read about in Sunday's New York Times. The 9th Circuit on Friday handed down an opinion justifiably excoriating the Chief Counsel's Office for the conduct of two lawyers who committed fraud on the Tax Court. The incident occurred a number of years ago, but the lessons to be learned are fresh. A lead test case was chosen to resolve a tax shelter in the Tax Court. About 1300 taxpayers signed piggyback agreements to be bound by the outcome of the test case. The IRS lawyers agreed to a secret settlement with the taxpayer in the lead case that remained undisclosed and unavailable to anyone else. Then, the settling taxpayer testified that there had been an understanding that the documents underlying the shelter were not to be enforced. The settlement came to light after the Tax Court sustained the entire deficiency and the negligence penalty because the decision documents did not reflect the Court's opinion. The Dixon case presented the issue of what remedy was appropriate to rectify the effects of the fraud. The Tax Court refused to hold an evidentiary hearing on the taxpayers' allegations, and the Ninth Circuit reversed. After holding the mandated hearing, the Tax Court found that fraud on the court had been committed but that it was harmless error. The recent reversal makes clear that fraud on the court is never harmless; the Ninth Circuit decided that the appropriate remedy was to give to all of the affected taxpayers the same settlement that the IRS lawyers had granted to the lead test case. I want you to know that I fully concur with both the Ninth Circuit's outrage over the fraud and its mandate. Is there any taxpayer who could believe that he or she would receive a fair trial of their cause if IRS lawyers could secretly offer a deal in the lead test case and then offer tainted testimony to convince a court that the transaction at issue was unsound? Fraud on any court is, in my view, not only pernicious to the fair resolution of the particular case, but also threatening to fundamental democratic principles. As an institution, the Office of Chief

Counsel must adhere to the highest standards of conduct not simply conform to minimum professional obligations.  In connection with implementing the Ninth Circuit's mandate, I have instructed our attorneys to do the following:

1.  We will expeditiously implement the Ninth Circuit's mandate to extend to all affected taxpayers the terms of the settlement that were effected in the lead test case.  We will also assure that no interest is charged on deficiencies for the period of the appeals to the Ninth Circuit.

2.  I am circulating a copy of the Ninth Circuit's opinion to all of my lawyers with a cover memo reiterating the duties that we have as officers of the court and as lawyers for the Commissioner.  We must admit the pernicious nature of this conduct and not permit it or anything like it to be repeated.  There can be no harmless error resulting from fraud on the court.

3.  I will correspond with the Ninth Circuit to apologize for the conduct and indicate what steps I will take to avoid such conduct in the future, including specific professional education efforts.

*     *     *     *     *     *     *

* * * I want to reiterate that I expect and demand that Chief Counsel lawyers live up to the highest professional standards and engage in best practices.  Our goal as IRS lawyers cannot be to collect the most revenue for the government or win cases at all costs.  Our goal must be to ensure that the tax system is administered fairly and impartially and that we reach the right result for the taxpayers and the government.

Although some would like to deny that the tax system plays a vital role in society, and few of us actually like paying taxes, confidence in the integrity and fairness of the tax system is vital to our democracy.  The tax system touches more people in this country than any other part of the government or our laws. The loss of confidence in its integrity is the loss of confidence in the government itself.  * * *

APPENDIX B


Excerpts from Chief Counsel Notice CC-2003-008
Deborah A. Butler, Associate Chief Counsel
(Procedure and Administration)

Purpose

This notice reminds all Chief Counsel attorneys of their
obligation to adhere to the highest ethical standards in all
aspects of their responsibilities, including representation of the
Commissioner before the Tax Court.

Discussion

The Chief Counsel is the chief law officer for the Internal
Revenue Service. As such, the Chief Counsel is empowered to
represent the Commissioner in cases before the Tax Court, and to
determine which civil actions should be litigated under the laws
relating to the Internal Revenue Service, including making
recommendations to the Department of Justice regarding those
actions. I.R.C. § 7803(b)(2). In carrying out these duties, Chief
Counsel attorneys must be mindful that they are acting on behalf
of the Chief Counsel, not in their individual capacity, and that
their actions reflect on the entire Office of Chief Counsel, the
Service and the Treasury Department. See CCDM 35.8.12.14.
Accordingly, Chief Counsel attorneys are expected to adhere to the
highest standards of conduct, not simply conform to minimum
professional obligations.

To help put this principle into practice, Chief Counsel
attorneys are reminded that, in representing the Commissioner,
they must conduct their activities in accordance with the letter
and spirit of the Model Rules of Professional Conduct of the
American Bar Association. * * * Our role as Chief Counsel
attorneys is to ensure the uniform application of the tax laws and
the fair disposition of cases.

*     *     *     *     *     *     *

As officers of the court, we have a special duty to avoid
conduct that undermines the integrity of the adjudicative process.
We should not allow a court to be misled by false statements of
law or fact, or evidence that the lawyer knows to be false. We
must ensure that our actions (or failure to act) preserves the

sanctity of the court and safeguards the public's confidence in the judicial process.

* * * * * * *

ABA Model Rule 4.1 provides, in part, that in the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person, or fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited under ABA Model Rule 1.6 regarding client-lawyer confidentiality.

* * * It is also professional misconduct under Rule 8.4 for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.  Similarly, under Rule 8.4, it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

* * *[In Dixon V],the Ninth Circuit imposed sanctions against respondent because two Chief Counsel attorneys committed fraud on the Tax Court during the trial of the cases.  Briefly, the Chief Counsel attorneys entered into secret settlements with two of the test case petitioners and a witness in the trial of a group of test cases intended to resolve a large tax shelter litigation project.  Although the settlements were all different, some noteworthy terms included an agreement that the settled test cases would nonetheless proceed to trial; that the petitioners would testify for the respondent; and in one test case, that any deficiencies would be reduced by the amount of the petitioner's attorneys fees.  With respect to the settling witness who testified for respondent at the trial of the test cases, the witness's deficiencies were conceded in full by respondent following the test case trial.

These settlements were not disclosed to the Tax Court or to the other taxpayers in the tax shelter litigation project who had agreed to be bound by the outcome of the test cases.

* * * * * * *

* * * All Chief Counsel attorneys are expected to carry out their responsibilities with the utmost integrity.  Clearly, the conduct of the Chief Counsel attorneys in <u>Dixon</u> fell far short of those high standards.  * * *